| | |
|---|---|
| 1 | LOUIS M. BUBALA III, ESQ. |
| | Nevada Bar No. 8974 |
| 2 | KAEMPFER CROWELL |
| | 50 W. Liberty Street, Suite 700 |
| 3 | Reno, Nevada   89501 |
| | Telephone:   (775) 852-3900 |
| 4 | Facsimile:    (775) 327-2011 |
| | Email:  lbubala@kcnvlaw.com |

*Electronically Filed*
*August 23, 2018*

5

6   Attorneys for Secured Creditors
    Owens Financial Group, Inc.,
7   Seventeen Enterprises, LLC, and
    Pacifica Land Conservation, LLC

8                    UNITED STATES BANKRUPTCY COURT

9                           DISTRICT OF NEVADA

10  In re:                              | Case No.:   BK-N-18-50535-btb
                                        | Chapter 11
11  ROCKAWAY WORKFORCE HOUSING          | **NOTICE OF FILING TRANSCRIPT OF**
    PARTNERS, LLC,                      | **FIRST MEETING OF CREDITORS**
12                                      | **CONDUCTED JUNE 18, 2018**
                Debtor.                 |
13                                      | Hearing Date:   N/A
                                        | Hearing Time:

14

15          Kaempfer Crowell obtained the audio recording of the Chapter 11 creditors meetings from

16  the Office of the U.S. Trustee and engaged Peggy B. Hoogs, a certified court reporter, to transcript

17  the hearing conducted on June 18, 2018.  The transcript is attached hereto.

18          Dated this 23rd day of August, 2018.          KAEMPFER CROWELL

19

20                                          By: */s/ Louis M. Bubala III*
                                            LOUIS M. BUBALA III, ESQ.
                                            Attorneys for Secured Creditors
21                                          Owens Financial Group, Inc.,
                                            Seventeen Enterprises, LLC, and
                                            Pacifica Land Conservation, LLC

22

23

24

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

2202335_1.docx  18607.1

Page 1 of 1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

-oOo-

IN RE:                              Case No. BK-18-50535-btb

ROCKAWAY WORKFORCE HOUSING          Chapter 11
PARTNERS, LLC,

        Debtor.

========================================================

TRANSCRIPTION OF AUDIO-RECORDED PROCEEDINGS

341 MEETING

Monday, June 18, 2018

Reno, Nevada

Transcribed By:  PEGGY B. HOOGS, CCR #160, RDR, CRR

1

1                    -oOo-   APPEARANCES   -oOo-

2

3    FOR THE DEBTOR:

4         WHITE LAW CHARTERED
          By:  JOHN WHITE, ESQ.
5         335 West First Street
          Reno, Nevada 89503

6

7

     FOR THE CREDITORS PACIFICA LAND CONSERVATION, LLC and
8         SEVENTEEN ENTERPRISES, LLC.

9         KAEMPFER CROWELL
          By:  LOUIS M. BUBALA III, ESQ.
10        50 West Liberty Street, Suite 700
          Reno, Nevada 89501

11

12

     U.S. TRUSTEE:
13
          NICK STROZZA
14        Assistant United States Trustee

15

16   ALSO PRESENT:

17        JOHN HICKEY

18

19

20

21

22

23

24

2

1                                    INDEX

2      WITNESSES FOR THE DEBTOR:

3         JOHN HICKEY                                           PAGE
             Examination by U.S. Trustee Strozza                    6
4            Examination by Mr. Bubala                             29

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                              -oOo-

2              RENO, NEVADA; MONDAY, JUNE 18, 2018

3                              -oOo-

4

5          U.S. TRUSTEE STROZZA:  Good afternoon.  I'm

6    Nick Strozza.  I'm the Assistant U.S. Trustee.  It's

7    June 18th.  It's about 2 p.m.

8              This is the first meeting of the creditors

9    scheduled for the case of Rockaway Workforce Housing

10   Partners, LLC.  It is Case No. 18-50535.

11             The meeting is being electronically recorded,

12   so you need to answer audibly for it to get picked up.

13   Shaking heads and stuff like that doesn't really work.

14   There's an attendance sheet for creditors to sign in on.

15             I'll go through some basic questions, maybe go

16   through your schedules a little bit, and then I'll turn

17   it over to counsel who's present -- and I'll get your

18   appearances in a second -- and they may ask some

19   questions, too.

20             Counsel, can you identify yourself for the

21   record?

22             MR. WHITE:  I'm John White with White Law

23   Chartered, counsel for the debtor, proposed counsel for

24   the debtor.

                                4

1          U.S. TRUSTEE STROZZA:  Okay.  Would the

2     representative of the debtor state your name and your

3     position or title with the debtor.

4          MR. HICKEY:  John Hickey.  I'm president of

5     Rockaway Workforce Housing Partners, LLC.

6          U.S. TRUSTEE STROZZA:  And would you please

7     stand and raise your right hand or just raise your right

8     hand.  You don't have to stand.

9          (Mr. Hickey was sworn.)

10          U.S. TRUSTEE STROZZA:  Counsel, we have one

11     counsel present.  Why don't you make your appearance for

12     the record.

13          MR. BUBALA:  Louis Bubala with Kaempfer

14     Crowell, counsel for Seventeen Enterprises, LLC and

15     Pacific Land Conservation, LLC.

16          U.S. TRUSTEE STROZZA:  Okay.  Great.

17          Counsel, we spoke a little bit briefly before

18     this meeting, and you've submitted your employment

19     application.  Thank you.  I'll take a look at that and

20     get back to you if we have any issues with that.

21     /////

22     /////

23     /////

24     /////

```
 1                           JOHN HICKEY,

 2                    having been first duly sworn,

 3                 was examined and testified as follows:

 4

 5                           EXAMINATION

 6   BY U.S. TRUSTEE STROZZA:

 7        Q   Mr. Hickey, did you help prepare the schedule

 8   of assets and liabilities that have been filed in this

 9   case?

10        A   Yes, I did.

11        Q   Did you sign them?

12        A   I believe so, yes.

13        Q   Okay.  And to the best of your knowledge, are

14   they truthful and accurate?

15        A   Yes, they are.

16        Q   Are there any changes that you know of today

17   that need to be made to them?

18        A   Not at this time.

19        Q   Tell me why the debtor -- and if I say "you," I

20   mean you the debtor, not you personally in this, if I get

21   a little colloquial on that.

22            What caused this debtor to file bankruptcy?

23        A   It has -- well, it was in foreclosure for an

24   existing note and deed of trust that -- the note is
```

1    secured by one of the assets of the entity.

2         Q   Let me back up.

3             What does this debtor own and do, or what is

4    this debtor?

5         A   This debtor owns land, and it's going to

6    develop for workforce housing, and it's like affordable

7    housing, but it's a little higher income, and it also has

8    the rights to a 6-acre parcel of commercial property that

9    is currently owned by the State -- well, State of

10   California has title to it.

11            The Rockaway Workforce owns all the abutter

12   rights to that property.  We've got unlimited

13   egress/ingress over that property, and as of a couple of

14   months ago, the State of California has given the City of

15   Pacifica, which is where the property is located, they

16   sent them a letter telling them we are authorized to

17   submit any development plans we want for that parcel

18   because they're in the process of transferring title to

19   us.

20        Q   Now, did you have to pay for that parcel or it

21   just goes back to you --

22        A   Under the code section, under the code section,

23   which Caltrans sent me, it says it has to go at appraised

24   fair market value.  However, since we own all the

1    abutter's rights, it is of zero value to Caltrans.  So

2    the value to us is very high; the value to Caltrans is

3    zero.  They can't -- in the code section they sent me,

4    they can't even sell it to anybody else or give it to

5    anybody.

6         Q   Okay.  When did the debtor buy this property

7    and for how much?

8         A   We paid -- this property was acquired with four

9    other smaller parcels which totaled about 3 acres.  The

10   parcel we owned, this 620 parcel, it's actually 56 acres,

11   the one that's secured -- is used as security with the

12   installment note.  There's 56 acres.  There were four

13   other parcels that were acquired along with it.  They

14   total about 3 acres.  We paid the credit -- secured

15   creditors 8.1 million for that property, and to date

16   we've made them about 4.6 million in cash.

17        Q   So the purchase price was the 8 million?

18        A   8 point -- exactly.

19            The Caltrans property was not included in that

20   at all.  I mean, we were -- our contract, which I

21   brought, includes the -- specifically includes the right

22   to the Caltrans property because there is a linkage under

23   the California code to that property because of what --

24   Caltrans has to go through the steps, but that's the

1    limitations placed on Caltrans, that's not the

2    limitations placed on the owners of the property.

3          So that property has a completely different

4    additional value that was not included in the purchase

5    price.

6          Q   So what kind of land is it?  Is it --

7          A   The 56 acres?

8          Q   It's raw land, but, I mean, is it trees?  What

9    does it look like?

10         A   The 56 acres is a sloping hillside.  In fact,

11   on the back end it goes pretty high, but -- and Pacifica,

12   it's all rolling hills, and we've got -- it's all zoned

13   residential except the Caltrans property, which is

14   adjacent to Highway 1.  It abuts Highway 1 with 700 feet

15   of frontage, and that property is -- the elevation on

16   there is -- it still is an incline, but it's nothing like

17   the -- about half a mile in, the property really starts

18   to climb.

19         Q   And you indicated -- I'm sorry if I'm jumping

20   around a little bit, but you indicated that the

21   development is for a workforce housing or low-income

22   housing?

23         A   Correct.  We had initially proposed 12 units of

24   affordable housing to the City of Pacifica, and when we

1    went around to the different community groups -- we went

2    and we spoke to them about doing that kind of housing --

3    the groups we spoke with, they actually were not

4    interested in the affordable housing.

5            There's a housing crisis in Pacifica, but they

6    don't necessarily meet the definition that's required for

7    the affordable housing at 30 percent AMI, 50 percent AMI.

8    What they wanted was something that was more akin to rent

9    control, and they just last November had a rent control

10   measure on the ballot that failed.

11           So what they asked us to do was to basically

12   put on some type of workforce housing that would be tied

13   to the area HUD fair market rent that they publish every

14   year for that particular region.  So the idea, when that

15   portion of this goes forward, would be to put housing in

16   there that is actually tied to the local HUD FMR, you

17   know, in terms of setting rents for the thing since rent

18   control -- well, it's not legal in Pacifica, they didn't

19   didn't pass it, and it's not that we can't do affordable

20   housing; it's just that they didn't want it because then

21   they wouldn't meet the income -- at least the groups we

22   met with, they don't meet the 30 percent and the

23   50 percent.  So we were pretty much down to creating some

24   kind of a hybrid.

1          The Caltrans property is completely separate

2     and will not be developed by the same entity at all.

3          Q   Okay.  Now, when you talk about development, is

4     this just an idea?  Are there plans?  Are there

5     renderings?

6          A   Oh, yeah.  It's been fully engineered,

7     definitely.  The only thing that we haven't -- in fact,

8     we've got -- for the Caltrans site, we've got an assisted

9     living ALMC developer that wants 2 acres -- of the

10    6 acres, they want 2 acres.  We've got a letter of intent

11    from these guys for $6 million just for two acres of that

12    parcel.

13         Q   Right.  What's the cost of development?  What

14    is your projected cost to develop this property and where

15    is that money coming from?

16         A   Well, we have to put in a road from -- we have

17    to put in a roadway off of Highway 1 up through the

18    Caltrans site, and the 56 acres is behind the Caltrans

19    site.  So the Caltrans site is a big rectangle.  56 acres

20    is up here.  Due to the topography, the -- actually, the

21    only place you can really enter the 56 acres is, like, in

22    the upper right-hand corner, so you -- we've got to come

23    in off Highway 1, it's about 300 feet deep, and at that

24    point we hit the property line for the 56 acres.  It's

1    going to cost us about 2-, 2-1/2 million to get the

2    intersection here and get the roadway up into the

3    Caltrans site.  We don't need to continue into the

4    56 acres -- that can stop right there, we can stub it

5    out -- until that project goes forward.

6             So for this here with retaining walls and

7    everything, it's going to be about 2-1/2 million to get

8    that roadway up in here, okay.  For the -- our plan --

9    well, we're going to do a formal plan -- but is

10   essentially to, from the -- like from the property sales

11   here, it will take those guys about nine months to a year

12   max to get their assisted living development approved in

13   Pacifica, and, again, it's on the Caltrans site, which

14   means they can submit their plans right now.

15            So that's 2 million cash at close of escrow.

16   We owe the secured creditors a million eight, and come

17   August 31st of this year, we owe them right now about

18   500,000, and we've got a partner that is actually

19   taking -- is going to -- is acquiring 50 percent of what

20   we're doing as we put up the money to give them the

21   500,000 we owe them.

22        Q   So let's go back to the question I asked, and

23   I'll circle back around.

24        A   Sorry.

1      Q   No, no.

2          Why did you file bankruptcy?

3      A   Well, there's -- like I said, they were

4  foreclosing, and we had attempted to pay off that note,

5  okay.  We did two things.  We wanted to pay off the note

6  and we wanted to buy the note from them, okay, which we

7  have the right to do.

8          There is an issue in this, which is when we

9  went into this contract to buy the property back in 2015,

10  they put in a clause that said there was -- again, they

11  had been planning on doing a conservation easement, and

12  the entity that owned this property was called Pacifica

13  Conservation or whatever the heck the name of that was,

14  okay, but Congress -- that law used to -- it used to

15  sunset, it had a sunset provision.  Every now and then

16  the thing would expire.

17          So in 2015 when we went into contract, the law

18  had expired and the conservation easement deduction for

19  IRS purposes did not exist at that time.  So when we

20  negotiated the contract -- we entered into the contract

21  in June of '15 -- we had negotiated the price, and they

22  had been planning out -- the sellers, which were also the

23  secured creditors, had been planning on doing a

24  conservation easement somewhere on the property.

13

1        So as we got through the contract, we

2    negotiated the price, and then they said, "Well, okay.

3    Look, there's a possibility that Congress may someday in

4    the future put that conservation easement legislation

5    back in place," so there's a provision in our contract

6    that says -- and we were supposed to close in -- in

7    August of 2016, a year after we went into contract, a

8    year plus, which we did.  We closed, I think it was,

9    September, and so in June of '15 this provision was put

10   in the contract that said, okay, if sometime between

11   December 31st of 2016, after we close escrow, and the

12   time the installment note was to be paid off, which was

13   September of 2020 because it's got one payment annually,

14   okay, if at any time in between there Congress puts the

15   conservation easement law back into effect, then we, the

16   buyers, have the option of deciding if we want to do a

17   conservation easement.  And if we do -- and it's totally

18   up to our discretion -- if we want to do it, they are

19   entitled to 50 percent of whatever the deduction is,

20   whatever the deduction is, okay.

21        And there was no description of that

22   conservation easement has to be this big, what it has to

23   be, nothing.  Okay.  It was undefined.

24        So if we did the conservation easement, they

1    were entitled to 50 percent of the deduction.  If we

2    decide -- again, this assumes Congress put the law back

3    in -- if we decide we don't want to do the conservation

4    easement and the law is effective again, we owe them a

5    million dollars as basically a buyout fee for not doing

6    the conservation easement.

7              Somewhere in there after we went and we were in

8    contract -- I think it was during 2016 -- Congress was

9    redoing a bunch of the renewable energy tax benefits and

10   whatnot, and so they actually -- they made permanent --

11   it turns out they made permanent the conservation

12   easement deduction in 2016.  At least -- I mean, it says

13   it's permanent, okay, no more sunset clause.

14             So when we went to close escrow, again, you --

15   and it was all very detailed in the note and in our

16   purchase contract which had terms of the note that if

17   the -- the extra million dollars is going to be in here

18   in the note itself because we had until 2020 to decide,

19   and then there was -- let's see -- they had --

20        Q   So there's a dispute between you and them with

21   regards to this million dollar conservation issue?

22        A   Correct.

23        Q   That needs to be resolved?

24        A   Correct.

1      Q   And you're attempting to use the bankruptcy

2  potentially to help resolve that?

3      A   Yes.  And there's also an issue with the

4  Caltrans property we would potentially like to get

5  resolved.

6      Q   So you owe them what, a million something in --

7  when was your first installment due?  When was your last

8  installment?

9      A   The first installment was due in August of '17,

10  and in September of '17 we paid them about 1.6 million,

11  1.5 -- 1.5, 1.6 million.

12      Q   You were about 100,000 short?

13      A   No.  We were actually -- somehow we were

14  $376,000 short.

15      Q   Okay.

16      A   And we signed a forbearance agreement until

17  December 31st, and on our end -- and they gave us -- the

18  note also has partial lien releases on dollar-for-dollar

19  collateral.

20          So when they got that payment, that was all

21  that was required to get the last of the four small

22  parcels to go -- to get released from the note and free

23  and clear.  So they recorded a deed of reconveyance, and

24  they got the 1.5, 1.6 million, and we had a forbearance

1    agreement for 376,000.

2              We couldn't pay them on December 31st, so on

3    January 19th they recorded the NOD on the property to go

4    forward.  Subsequent to that and somewhere in there, I

5    made at least two proposals to the secured creditors.

6    One was to let us come in and put a new first on the

7    property, and then they would continue to -- and their

8    note has this million dollar conservation easement figure

9    in there -- was to let us put a new first on the

10   property.  They would get paid off most of what they were

11   owed, but they would end up taking a second for -- I

12   can't remember what the -- what the figure was.  It might

13   have been a million five or something to that effect.  I

14   really don't remember what that figure is.

15             After that I went to them sometime, I believe

16   it was in April or -- might have been in -- must have

17   been in April, I think, and we said, "Okay.  Look, we'll

18   pay you guys -- we had a lender lined up to put the money

19   in for this."  We said, "We'll give you $3.8 million for

20   the $4.8 million note that's due.  The million dollars is

21   the conservation easement cancellation fee."

22             So I told them, we said, "We'll give that to

23   you."

24             And their response was, "No.  We'll take the

1  3.8 million, and we'll give you the million dollars less,

2  but you have to give -- you have to do the conservation

3  easement and you have to give us the first $10 million

4  worth of deduction, and then we'll agree to take the

5  3.8 million.

6          Well, what I started to tell you earlier about

7  the conservation easement deduction is that they put it

8  in the contract as additional revenue to them.  Unless

9  you are on title, you cannot take a deduction for the

10  conservation easement.  It's impossible.

11          Q   Okay.

12          A   So that -- that clause is of no value to them

13  whatsoever, none.  I mean, they could force us to go out

14  and put a conservation easement on the property of some

15  amount, but it would only be in spite because they're not

16  entitled to the conservation easement because they can't

17  take it.

18          And then here it had transgressed to, okay, we

19  were offering them dollar for dollar on the note -- they

20  wouldn't take it -- dollar for dollar aside from the

21  million dollar conservation.  They wouldn't take it.

22          Now, we're entitled to pay them off early.

23  They wouldn't take it.  They were going forward on

24  foreclosing on the note.  They know where I'm at with the

1    Caltrans people.  I've been -- for three years I've been

2    working on that, getting that property from those guys,

3    since we went into contract.  They've now given us a

4    letter three months ago, which they know I have, to go

5    ahead and process our plans through the City and, you

6    know -- so this -- I mean, we got to get this resolved

7    because we tried to pay them off.

8         Q   Okay.  I think I'm getting a good picture of

9    it.

10        So just in terms of the operation, it's just

11   raw land?  You have no insurance on it because it's just

12   raw land?

13        A   Right.

14        Q   The lender may have placed insurance on it or

15   maybe not even?

16        A   Yes.  We had force-placed insurance.

17        Q   Force-placed insurance.

18        There's no debtor-in-possession bank accounts

19   because there's no money at this time.  There's no

20   employees.

21        A   Everything paid for -- we've been paying for it

22   in other entities.  All the engineering fees over the

23   years, legal fees, everything, it's all been paid for in

24   other entities.

1    Q   There's no utilities involved with the

2    property, anything like that?

3    A   Huh-uh.

4    Q   Any employees, I said.

5        And the debtor maintains its own books and

6    records?

7    A   Oh, yeah.

8    Q   And we've made -- we've closed those out or

9    made a demarcation at the time of the petition so we can

10   kind of --

11   A   Right.

12   Q   Okay.  That was explained to you.

13       And it's what, an LLC, so the taxes are all

14   what, all pass-throughs or how's -- well, you guys filed

15   your own; right?

16   A   Yeah.  Yeah.  We've got the --

17   Q   You got a partnership tax return; right?

18   A   Right.

19   Q   Okay.  And I think you only did it for half a

20   year, though, so you still owe for next --

21   A   Yeah.  Because Rockaway Workforce, when we --

22   on the note there were two sellers.  They had two

23   entities, Seventeen and the conservation, okay.

24   Seventeen owned the four parcels, the conservation entity

1    owned the 56 acres, and when we got that from them, we

2    used -- we used two entities as well because we don't

3    want -- under the Subdivision Map Act in California, we

4    don't want the parcels to merge, so we used two entities

5    to buy from their two entities.

6            The note was one note, it had both entities

7    named, and it had all the collateral in there, so when --

8    after the payment was made in September of the last

9    million five or whatever it was, then they went and

10   Rockaway Workforce, there was -- there were two partners

11   in there, okay, and so one of the partners who's listed

12   on the return, one of the partners said, "Hey, you know

13   what?  Look, we'll -- we're happy to just take these four

14   parcels, these four small parcels, the 3 acres, we're

15   happy to go our own way."  So they did.  So they had an

16   allocated price of 4.6 million -- it's attached as an

17   exhibit to the note -- and they took those four parcels

18   and went their separate way.

19           Rockaway Workforce still has the 56 acres and

20   all the rights to the Caltrans property.  So that

21   happened right in September when that was done, so that's

22   why we had to file a short -- a final year, because of

23   the one -- when so much of the percentage of the LLC is

24   changing hands, the IRS makes you file a final return.

1      Q   Okay.

2      A   So that's all that was about.

3      Q   Okay.  So tell me a little bit more on the

4  transfer out.  So you had this 4-acre parcel which was

5  made up -- which was --

6      A   There were four parcels, 3 acres in total.

7      Q   And who got that and what was the consideration

8  for that?

9      A   $4.6 million was for 3 acres of property right

10  next to the Caltrans property.

11      Q   Okay.

12      A   And that went to one of the -- one of the

13  members, Rockaway Highlands.  They took that and they

14  walked away from Rockaway Workforce.  They gave away

15  their interest in Rockaway Workforce, and they gave up

16  their interest in Rockaway Affordable, which used to own

17  those four parcels.  Rockaway Affordable is now just a

18  shell entity, there's nothing in it.  Rockaway Workforce

19  has the 56 acres plus the rights to the Caltrans parcel.

20          So they took that for 4.6 million, they went

21  their way.  Rockaway Workforce is over here --

22      Q   And you don't need those 4-acre parcels to do

23  any development, anything?

24      A   No, nothing, nothing.  And like I said, the

1    creditors, they executed a deed of reconveyance on the

2    last of the four parcels when they got the million five

3    or million six last year.

4              Q   So everybody is happy with that transaction?

5              A   Right.

6              Q   There's no disputes or --

7              A   No.

8              Q   Okay.  You talked about having to resolve it.

9    There's no pending litigation in state court or anywhere

10   else, federal court, with respect to the parties here?

11             A   No.

12             Q   No, okay.  And to the extent there is

13   litigation, it's going to -- your intent was what, to

14   file it in the bankruptcy court here or to resolve --

15             A   If necessary, unless we could resolve this

16   here, because we did try to pay them off in full, so --

17   and there is an issue with the Caltrans property, like I

18   said.  Under the state -- for the streets and highways

19   code -- and Caltrans sent me the code sections that

20   they're using -- with that appraisal mechanism that's in

21   there, that is a lot of source of equity for us to pay

22   the installment note that's due to the secured creditors.

23                  And so we were hoping we could get some sort of

24   supervision in the bankruptcy court to make sure that

1    they actually give the proper instructions to the

2    appraiser instead of -- I mean, it's the State of

3    California.  It's like -- so they have no -- there's no

4    interest in it, I mean, in terms of --  so we just want

5    to make sure the proper instructions go to the appraiser

6    so they don't end up appraising it for what it's worth to

7    us versus what it's worth to them.

8          Q   Got it.

9          A   Okay.

10         Q   What's a realistic time frame on that Caltrans

11   part?

12         A   They told me they need another -- just last

13   week they told me in an email that they need another

14   45 days to complete the circulation because it goes to

15   about 20 department heads for comments when they're going

16   to decertify a piece of property, and they told me they

17   need about another 45 days for circulation and comment,

18   and then it will actually go through the decertification

19   process.  The whole thing should be over in, I'd say, six

20   months because they've been working on it since January.

21         Q   Okay.

22         A   And I'm working with the deputy district

23   director for Caltrans in charge of rights-of-ways and

24   easements, I mean, so that's -- so -- and they have --

1    they have -- Caltrans is getting rid of all of their

2    property rights along Highway 1 in this district, and the

3    guy that's actually handling this, he was the deputy

4    district director.  He retired.

5         The new guys brought him back in on a

6    consulting agreement to do one thing, which is dispose of

7    all Caltrans property rights along this highway, this

8    district.  So that's who I'm dealing with.  He used to be

9    the deputy district director.  I mean, that's his sole

10   job is to focus on getting rid of these properties.

11        So they told me they have -- they started on

12   this process in January, and like I said, I just got an

13   email that said they've got about 45 days of comments

14   left.

15        Q   Okay.  You put a value of about $29 million on

16   the property.  There's not a written appraisal to that

17   effect or anything like that; right?

18        Q   The creditors, secured creditors, had Cushman

19   Wakefield appraise the property before they sold it to us

20   for 20.3 million valuation.  They had it appraised for

21   the conservation easement that they wanted to do.  And

22   the Caltrans property is worth 8 million -- it appraised

23   out at 8,800,000, something like that, for the Caltrans

24   property, and like I said, the 3 acres next door were --

1    4.6 million that was valued at.

2         Q   So their 20- plus the 8- for the Caltrans gets

3    you close to the number?

4         A    That's what it was.  And on the forms, for the

5    million dollar reduction we wanted for the note, it

6    required us for some reason to list that million dollars

7    as an asset.  I didn't understand why.

8         Q   Okay.

9         A   So that could be off by a million dollars

10   because of what it required.

11             U.S. TRUSTEE STROZZA:  Okay.  And then,

12   Counsel, are we in a single-asset real estate case

13   situation here?

14             MR. WHITE:  As far as I can tell at this

15   time -- and I'm not an expert on it, but I've been

16   reviewing some cases in re --

17             U.S. TRUSTEE STROZZA:  I'm just saying, it

18   might be -- we may need to consider --

19             MR. WHITE:  The property is not single asset

20   at this time.  The best I can tell at this time, because

21   of the issues that he mentioned about the State of

22   California, we have rights to that property.

23   BY U.S. TRUSTEE STROZZA:

24        Q   So you think it's -- it's two pieces of

1    property rather than one?

2        A   Well, it's whatever --

3        Q   I gotcha.

4        A   Yeah, it's consideration.  If it is, then

5    there's time -- time is ticking on that in terms of -- in

6    terms of the secured creditor.

7            And it's not the same project because we're not

8    even developing the 56 acres now.  We're developing the

9    Caltrans property is what we're going to do.  Because

10   that's close to the highway, it's the smallest amount of

11   money, I mean to get the infrastructure and to be able to

12   sell off the parcel.

13           So the 56 -- all we're going to do is stub out

14   the road, so that's not -- when that thing goes forward,

15   we're not even sure what's going to happen.

16       Q   Is one of the options just to sell the whole

17   thing?

18       A   Well, like I said, it's like with the assisted

19   living guys here, the ALMC, I mean, we are selling off a

20   2-acre piece to them for $6 million and we've got -- that

21   leaves us almost another 4 acres.  We do have other

22   people that are interested in it, but in general we

23   haven't reached an agreement with anybody else yet.

24           So, I mean, that -- that's probably what we'll

1    do going forward.  We are considering putting senior

2    housing on there, but, again, we don't have anything

3    specific right now.

4         U.S. TRUSTEE STROZZA:  Okay.  I just have one

5    more question, I'll turn it over, and then I'll review my

6    notes as counsel is asking you.

7         The debtor understands the obligation to pay

8    quarterly fees --

9         MR. WHITE:  Yes.

10        U.S. TRUSTEE STROZZA:  -- and understands its

11   obligation to file monthly operating reports?  It will

12   probably be pretty simple, but you haven't retained --

13   are you retaining an accountant to prepare -- the debtor

14   is going to do it?

15        MR. WHITE:  The debtor is going to do it as far

16   as I know.

17        U.S. TRUSTEE STROZZA:  That's all the questions

18   I have at this time.  Why don't I turn it over to

19   counsel.

20        Why don't you identify yourself again for the

21   record, and I'm just going to flip through my notes as

22   you ask some questions.

23   /////

24   /////

1                            EXAMINATION

2    BY MR. BUBALA:

3         Q  So, again, my name is Lou Bubala.  I work with

4    Kaempfer Crowell here in town.  I've been hired by

5    Pacifica Conservation and Seventeen Enterprises, LLC to

6    represent them in this bankruptcy case.

7              So I've got some documents.  I'll start by

8    going through some of these and asking you some questions

9    on it.

10             I'll pull out a copy of the Installment

11   Non-Recourse Non-Negotiable Promissory Note listed at

12   6,332,295 -- I'm sorry -- $6,332,295 dated August 29,

13   2016.

14             John, here's a copy.

15             Mr. Hickey, here's a copy.

16             Mr. Hickey, are you familiar with this note?

17        A  I just -- I don't believe this is the right

18   copy.  We had to replace the note.  I was helping these

19   guys do a 1031 exchange after we did -- we agreed in our

20   contract to the installment note, and what happened was

21   they were going to -- at the last minute they decided

22   they were going to do a 1031 exchange, and so they had

23   the note go to their intermediary, which is named on

24   here.

1          Then they went and they got financing against

2    the note so they could get cash to close on their

3    exchange property up in Oregon, and we helped them

4    accommodate that.  I had to do an addendum to the note

5    for their secured creditor, and I'm not seeing that here.

6    And on top --

7          Q   I'm sorry.  Can you state first, what is

8    incorrect about this note?

9          A   This isn't the right note.

10         Q   What is --

11         A   Because we had to replace the whole note.

12   Their exchange company lost the original note.

13         Q   So the original note is not -- it's a different

14   date?  What changed in it?  Show me something in here or

15   identify something in here that makes you think this is

16   not the correct number.

17         A   Well, it's dated August 29th.

18         Q   What date do you believe it should be dated?

19         A   August 31st.  And we -- we did a whole new

20   note.  We did an absolute brand new note --

21         Q   Okay.

22         A   -- and a new deed of trust.  They did a deed of

23   reconveyance on the original deed of trust, and we

24   executed a new deed of trust, and we executed a new note

1    for them with a different date than this.  There's an

2    addendum to that note that we did.

3         Q   I'm not asking about the addendum right now.

4             What changed in the modification, in your

5    belief, between this note dated August 29th and the note

6    you say actually replaced it on August 31st?

7         A   What changed?  Well, the change would have just

8    been the date in the addendum, I believe.

9         Q   So your recollection is that this note dated

10   August 29th is the exact same except for the date of

11   August 31st?  On this note --

12        A   I'm sorry.  And it's also got a different

13   Exhibit A because on the Exhibit A it would say -- on the

14   new note it would say -- unless this one says it also,

15   let me see -- on the new Exhibit A it talks about --

16   yeah -- you see on Exhibit A here, the 220 and 230?

17        Q   No, I don't.  Are you talking about the parcel

18   numbers --

19        A   Yeah.  I'm sorry.

20        Q   -- in bold with an asterisk next to them?

21        A   Right.

22        Q   Yes.

23        A   On here the only parcel --

24        Q   When you say, "on here," where do you --

1        A    I'm sorry.  On Exhibit A the only parcel that

2    was collateral, that was remaining collateral was

3    Parcel 220 on the new note because what we did was we

4    allowed them three -- Parcel 300, 290, and 230 are zoned

5    commercial, and Parcel 220 was zoned residential, so when

6    we did the new note in December, we went ahead and put --

7    we took 230 -- we took Parcel 230 out of the collateral

8    and put 220 in the collateral.  And so -- and that's

9    not -- it's indicated on the new note and Schedule A.

10   It's not indicated in here.  This is the old one.

11        So then, also, on the new Exhibit A, it

12   specifies how much money has to be paid to release

13   Parcel 220 from the existing note to have it -- to have

14   it released.  So this just -- but, you know, it's -- this

15   isn't the correct note.

16        Q    But --

17        A    We changed the collateral.  Sorry.

18        Q    Okay.  From what I've heard you say, the terms

19   of the note are the same between August 29th and

20   August 31st.  What changed is the language in Exhibit A,

21   and you said there was an addendum that was also

22   executed?

23        A    Correct.  There was -- a different collateral

24   was put up for the note.  On this note, the collateral

1    was dollar for dollar based on the allocated price in

2    these tables, and what we agreed to instead, to make all

3    the commercial out and only the residential parcel in, we

4    agreed to -- we agreed to put 230 into the -- 230 came

5    out and 220 became the collateral, which meant that there

6    was -- out of the 2 million and change that was assigned

7    to this parcel as collateral, there was only $1.6 million

8    that was owed to actually get it released from the note.

9            So at this point in time we went in

10   overcollateralized on that -- and so there's -- it says

11   in the new Exhibit A that all you have to do is pay this

12   million six.  But to your point about the terms, I'm sure

13   the terms -- the terms are correct except for the date

14   being the 31st.

15      Q   And I apologize if I don't have the most

16   current.  This is what was provided to me by my client,

17   but I will speak to them.

18           So I'm going to come back to Exhibit A because

19   I'm not sure I understand part of what you're saying, but

20   from what you were testifying earlier, the million

21   dollars, you talked about this excess million dollars

22   tied with conservation easements.

23           You understand what I'm talking about?

24      A   Oh, yeah.

1      Q   Okay.  And I think you said something along the

2   lines that there was a provision in here, in the note,

3   that said you didn't have to pay for it or you might not

4   have to pay for it.

5      A   It's in our purchase contract.

6      Q   This one with Peekalux (phonetic)?

7      A   Yeah.

8      Q   Okay.  And do you know what section that's in?

9      A   Yeah.  It's like in the first few pages, page 3

10  or something to that effect.  There's a whole section

11  that deals with it.  There it is, page 6, 5.1.6.

12          Do you have a copy of this?  I know it well,

13  so --

14          MR. WHITE:  Do you have an extra copy of that?

15          MR. BUBALA:  I do, John.  Here's a copy.  Why

16  don't I give Nick my copy and you can keep your original

17  copy.

18          THE WITNESS:  Okay.  All right.

19          And to your question about the note reflecting

20  it, in the note itself it actually specifies that there

21  is -- there's a million dollars in here that does not

22  earn interest.

23      Q   Correct.

24      A   And in the contract and in here it says it's

34

1    treated -- we had no other way to treat it.  It's an

2    additional advance as treated under the note.  It doesn't

3    earn interest, it's not part of the purchase price.  It's

4    very clear it is a conservation easement.

5         Q  I'm sorry.  Can you point to -- I'm a little

6    bit confused here.  There's a value placed on the note --

7         A  Right.

8         Q  -- and there is a -- the opening paragraph is

9    broken down to 5,332,295 and $1 million.

10        A  Right.

11        Q  And even though the note says -- so that

12   combined is the 6,332,295 value of the note, but the

13   million dollars isn't owed under the note?

14        A  No no.  It is owed under the note.  We have the

15   right to cancel it because it's the conservation

16   easement.  In our contract it gives us until the maturity

17   date of the note to do a conservation easement and

18   give -- and they're entitled to 50 percent of the

19   deduction.  It's in this Section 5.1.6 of the contract.

20   It spells it all out.

21        Q  Okay.  On the note, page 7 of 7, there's a

22   signature line for the borrower.

23           Do you see that?

24        A  On page 7, yes.

1          Q   And it says -- maybe I'll mispronounce it --

2     for both Rockaway Affordable and Rockaway Workforce, it's

3     signed for by Arcanus Management Corporation as the

4     manager.

5          A   Right.

6          Q   What is Arcanus Management Corporation?

7          A   They're a company.  I don't know if they're

8     headquartered in Las Vegas or in Stateline, but

9     they're -- they are or were the managers for both of

10    these LLCs.  That's -- it's a business they have here in

11    the state of Nevada, and that's -- so we hired them to be

12    the managers of the company at the time, and there are

13    reasons -- I mean --

14          Well, anyway, it goes into whether or not -- I

15    mean, our partner has affordable housing projects right

16    now in the city of Pacifica, and there's some PR issues

17    with regard to the senior housing there, and it's always

18    in the newspaper about -- for one reason or another,

19    different maintenance and whatnot.  So Pacifica is a

20    pretty small town.

21          Anyway, so with this here, Arcanus, or however

22    you pronounce that, they have -- apparently in Nevada you

23    can have -- the ownership is not publicly -- publicly

24    known, and so that's one of the services they provide

1   here under Nevada state law.  That's -- and they act as

2   manager.  That's just what they do.  That's why they

3   signed these documents.

4        Q   And who's David Battrick?

5        A   He is the -- I don't know if it's his company

6   or -- they're -- like I said, they're located right in

7   Stateline up on Kingsbury Grade.  I don't -- I assume --

8   I could say I think it's his company, but I don't know

9   that for sure.

10       Q   How did you come across Arcanus?

11       A   You know, honestly, I can't remember.  I was

12  probably -- probably just looking for something online.

13  I really -- I don't remember how we found these guys.

14  We've got another registration agent somewhere for some

15  other entities that's out of Las Vegas, I think, so

16  that's just what -- and we wanted to use Nevada entities

17  for state tax purposes, so that's why we were looking in

18  the state of Nevada.

19       Q   And do you know where Arcanus is incorporated?

20       A   Unless I looked it up -- I mean, I don't recall

21  if I ever knew.

22       Q   Any other business arrangements with Arcanus?

23       A   No.  Just acting as manager, and they were --

24  well, yeah.  We actually rent -- well, I don't know if

1    it's them.  We rent office space from them in Stateline

2    so we've got -- but it's -- the name isn't Arcanus, it's

3    called Kingsbury Executive Suites, so that's -- I mean,

4    we rent office -- we're headquartered at that address,

5    and we rent office space from them.

6                Q   What's the tenant entity?

7                A   The tenant entity?

8                Q   Yes.  You say, "we."  I'm not sure who "we" is.

9                A   Oh, it's a situation where you can have

10   multiple entities on this -- for a single space.  So

11   Rockaway Affordable was the primary entity that was on

12   the lease up there, but that also included Rockaway

13   Workforce, and we have a 501(c)(3) that also, I believe,

14   uses that space.

15               Q   Is Rockaway Workforce on that lease?

16               A   Yes.

17               Q   Okay.  I don't recall seeing that scheduled

18   among your -- on your statement of financial affairs or

19   schedule.

20               A   It's a monthly -- it's a monthly service they

21   provide for the office space.  I mean, it's not like it's

22   a 10-year lease or 5-year lease, it's just month to month

23   kind of, but I'll be more than happy to submit a copy.

24               Q   I'll defer to your counsel.  I don't know that

1    you have a choice on not disclosing that, but, again,

2    it's up to you and your counsel to decide how to handle

3    that.

4         A   That's fine.  I'll be more than happy to email

5    a copy or whatever.

6              MR. WHITE:  There's one amendment.

7    BY MR. BUBALA:

8         Q   As much as I wish I had what you've described

9    as the second -- the changed Exhibit A to the note, let

10   me see if I can try to restate or recite what you've said

11   because I don't think I can do it.

12             In terms of the four other parcels, the 620 is

13   the large parcel --

14        A   Right.

15        Q   -- that this debtor, your entity here, has an

16   ownership interest in?

17        A   Okay.

18        Q   So we have the August 29th note in front of us

19   which lists four parcels which were pledged as security

20   or -- I'm sorry -- that were sold to Rockaway

21   Affordable --

22        A   Correct.

23        Q   -- and/or Rockaway Workforce.

24             And as I understood, you said Parcels 300, 290,

1    and 230 are commercial, commercially zoned, and 220 is

2    residentially zoned?

3         A   Right.

4         Q   And I'm sorry.  I was not clear as to what the

5    change was in the revised note dated two days later.  You

6    made a reference of removing or changing something about

7    the parcels, and I apologize for not --

8         A   No, no, no.  That's okay.

9             Just to be clear, the new note -- the note

10   wasn't actually changed until December.  It was about

11   mid-December when the new note got done.

12        Q   Okay.

13        A   They were trying to close on their financing.

14   They had -- they had put up this note as collateral to

15   another lender, and that lender wanted the original note

16   plus they would not -- they would not -- well, I don't

17   want -- we'll deal with that later.  I want to answer

18   your question.

19            So with regard to the parcels here, so the note

20   was done actually in mid-December.  As it was going

21   forward and they were trying to close with the -- they

22   were getting, like, 2.8 million against this from some

23   other lender, and so they couldn't close because the

24   person -- the company that's on here, their exchange

1    accommodator, IPX, I think their name is, they lost the

2    original note and they wanted to use a photocopy, which I

3    refused to go along with, and their lender was not happy

4    with, I believe, using a photocopy as well.  I certainly

5    wasn't going to agree to it.  So we did agree to execute

6    a new original note for them as long as they recorded a

7    deed of reconveyance on the old one.

8            So at that time we also were thinking of

9    developing the commercial property down -- because these

10   three commercial parcels are located down adjacent to

11   Highway 1 in Pacifica.  So at the time we were thinking

12   that, okay, maybe we will find a commercial developer who

13   wants to go ahead and develop that -- whatever -- I think

14   it's about an acre and a half of the total, something

15   like that, and it would have been complicated because one

16   of the parcels, the 230, was going to be included in the

17   deed of trust and note.

18           So to make that clean, we decided to go ahead

19   and take the commercial property free and clear and let

20   them have the 220 parcel as the collateral, which was

21   worth more than -- anyway, like I said, we had been doing

22   dollar-for-dollar lien releases even from the day we

23   closed escrow, so on here we just agreed to do that

24   because it freed up the commercial property.  We actually

1    swapped some out, I think is how it went, but the bottom

2    line is, 220 stayed in and everything else was out.

3            And so that change was made at that time,

4    because that actually -- we were overcollateralized, but

5    that's okay because we wanted the three commercial

6    properties free and clear so nobody had to deal with the

7    note and deed of trust if they came in.

8        Q   So not trying to put words in your mouth, but

9    let me try to put it in my language, and tell me if I've

10   got this right.

11           So based on what my clients had to do when they

12   were pledging all this, the note was gone, so you wrote a

13   new note.  Based on the payments that your client or your

14   entity had already made, they went ahead and did the

15   reconveyance or the release of the deed of trust on the

16   three commercial properties, 300, 290, and 230?

17       A   No, not exactly.  When we closed escrow,

18   some -- when we closed escrow, there were -- two parcels

19   were covered by the -- it should be in the note and

20   deed -- in the deed of trust.  When we closed escrow, two

21   of the parcels were, I believe, included in the deed of

22   trust and two were out, and so when we did the new

23   note -- so right at the day we closed escrow, okay,

24   because we paid 2.7 million at the close of escrow,

1   $2.7 million for the property came out free and clear

2   right from day one.

3           So when we redid the note in December, it

4   was -- we reshuffled that, so it was like to get that

5   extra commercial property.  So we ended up putting 220 in

6   to get the smaller commercial property out, and like I

7   said, it was a convenience factor, so now we could do a

8   deal with somebody on the commercial.  So that's --

9       Q   I understand what you're saying.  Okay.

10          What's your source of funding for the purchase?

11  The funds that were put into escrow, what was your source

12  of funding?

13      A   It came from the LLC members, primarily the

14  partner.

15      Q   And who were the LLC members of Rockaway

16  Workforce?

17      A   Rockaway Highlands primarily put up most of the

18  money for the properties, and they went their separate

19  way in September of 2017.

20      Q   Okay.  At the time of the purchase, let's say

21  August 2016, how many members were there in Rockaway

22  Workforce Housing Partners?

23      A   There were two members in each entity, two

24  members in Rockaway -- they were identical, Rockaway

1    Affordable and Rockaway Workforce, two members.

2         Q   And who were those two members?

3         A   Pacifica Highlands -- no, sorry.  Rockaway

4    Highlands, LLC and Pacifica Affordable Housing Partners.

5         Q   Okay.  And who were the members of Rockaway

6    Highlands?

7         A   It's a family.  I don't actually know the exact

8    membership makeup of that.  It's just a family that used

9    to be clients or -- I've known them for a long time.

10   They're friends of ours.  I helped them buy some senior

11   housing and some other stuff.

12        Q   What's the family's surname?

13        A   The last name is Ngo, N-g-o.

14        Q   Okay.  And where are they out of?

15        A   Out of?

16        Q   Where do they live?

17        A   In the South Bay, all around the South Bay

18   Area.

19        Q   So Julia Ngo?

20        A   Yeah, Julia Ngo.  She's the main spokesperson

21   or whatever you want to -- representative.

22        Q   And then the other entity, Pacific -- I'm

23   sorry --

24        A   Pacifica.

1     Q   -- Affordable Housing Partners, LLC, who are

2     the members of that entity?

3     A   That entity is owned by a trust right now.  It

4     was owned by my mother, and that entity is now owned by a

5     trust for my son.

6     Q   What's the name of the trust?

7     A   Global Resource Trust.

8     Q   And who's the trustee of that?

9     A   Kevin Gallagher.

10    Q   Who is Kevin Gallagher?

11    A   Somebody I've known for a long time.

12    Q   Is he a baseball player?

13    A   No.

14    Q   Convict?

15    A   No.  He's just somebody I've known for a long

16    time.

17    Q   Where does Mr. Gallagher live?

18    A   Chicago or Chicago area.

19    Q   Okay.  What does Mr. Gallagher do for a living?

20    A   Honestly, I don't know anymore.  He had his own

21    company for many years.  He had various messenger

22    companies and I'm not sure what all.  I am not sure

23    exactly what he's doing right now.  I know he's working

24    for -- I think it's a related type of delivery company.

1    They do a lot of work with Amazon and a bunch of other

2    people or companies they make deliveries for.

3            Q   And what's the value of the trust?

4            A   Just what these assets are.

5            Q   The trust has no other assets?

6            A   No.

7            Q   You scheduled -- I'll call it IPX or -- what is

8    it? -- Investment Property Exchange Services --

9            A   Right.

10           Q   -- is a creditor in this case?

11           A   Only because the note was -- had their name on

12   it.  Honestly, I don't know who owns the note right now.

13           Q   Okay.

14           A   IPX is on this note, and it's on the new note,

15   because they were doing an exchange -- I understand

16   that -- then they used this note as collateral for a new

17   note with Owens Financial Mortgage.  They're a publicly

18   traded REIT.

19            I got a notice in the mail from Owens Financial

20   telling me the note and deed of trust had been assigned

21   to them, and then on the -- I think on the NOD or

22   something like that or on the trustee sale it says that

23   IPX is on there as the entity foreclosing or something

24   like that, so I'm totally confused.  I don't know who

1    owns what over there.

2            Q   Okay.

3            A   So we just put everybody.

4            Q   Do you have a copy of the petition that was

5    filed on this case?

6            A   I'm sure somewhere.

7            Q   I'm sure John does.  I'll give you a copy of

8    the petition.  It's Docket No. 1.  If you turn to the

9    back, page 4 --

10           A   Okay.

11           Q   -- you signed it here as John Hickey as

12   president?

13           A   Of Workforce Housing.

14           Q   But the note was signed by somebody else.

15           A   Yeah.  The note was signed by the manager of

16   the LLC.

17           Q   Why did the manager sign the petition?

18           A   Because I gave him the authority to do so.

19   It's a -- we have officers and we have a manager for the

20   LLC, and the officers have been empowered to do all the

21   transactions for the LLC.

22           Q   I'm curious.  Who told you that a Nevada LLC

23   can have officers apart from the manager?

24           A   I don't recall.  I don't know.  It's just in

1    the operating agreement that we got from the Arcanus

2    Management Company.

3         Q   Okay.  Does Mr. Battrick know you filed for

4    bankruptcy?

5         A   I don't know if he does or not.  We were

6    replacing him.  I sent him -- I think I sent him

7    something.  When we did the -- when Rockaway Highlands

8    was taken out, their redemption, the document we did

9    redeeming them out, it was indicated that I was going to

10   take over as manager on the LLC.  So I sent those up to

11   Mr. Battrick or whatever his name is.  I mean, that's --

12   he got notice that he's no longer manager.

13        Q   Okay.  Do you have a copy -- do you keep a copy

14   of whatever you sent him?

15        A   I'm sure we do.  I don't know if I have a copy

16   of it with me.

17        Q   Okay.  That's something your counsel can

18   provide to me?

19        A   Oh, yeah.

20             MR. WHITE:  A copy of what now?

21             THE WITNESS:  Where we informed David Battrick

22   that he was no longer manager.  We sent him a copy of the

23   resolution to the redemption agreement.  So in there, in

24   this resolution, it states -- one of the things it states

1    is that I'm taking over as manager for the LLC.

2    BY MR. BUBALA:

3         Q   The Caltrans parcel, you understand what that

4    is?

5         A   Yes.

6         Q   It's the 5 acres?

7         A   Right.

8         Q   Do you have a current agreement with the State

9    of California, Caltrans, whoever the owner of that parcel

10   is, do you have an agreement to purchase that from them?

11        A   Here's the letter they wrote to the City of

12   Pacifica in February telling the City they're -- we've

13   got the authority to file development plans on the site

14   and they're going to sell it to us, and I say "sell it to

15   us" because there's some code sections that they sent me

16   that that's how it's listed in the code.  So it --

17             MR. WHITE:  Did you bring any copies of that?

18             THE WITNESS:  You know, John, I don't think I

19   have that, but I can certainly make those code

20   sections --

21             MR. BUBALA:  Afterwards can you make a couple

22   copies of these for us.

23             THE CLERK:  Sure.

24   /////

1    BY MR. BUBALA:

2         Q   Keep that there, and I won't take up the time

3    reading that right now.

4             I think you answered this before.  You said on

5    your schedules, when you valued Parcel 620 --

6             U.S. TRUSTEE STROZZA:  How many copies do you

7    need?

8             MR. WHITE:  Just two, I guess.

9             MR. BUBALA:  I think so.  Or maybe three if --

10   BY MR. BUBALA:

11        Q   The two parcels, 620 and the Caltrans parcel on

12   which you had the appraisal, that was an appraisal that

13   was done by my clients?

14        A   The 620 parcel, your clients did the Cushman

15   Wakefield appraisal.  It was 20,300,000.

16        Q   And then for the Caltrans parcel, you have an

17   appraisal that says its value is based on the appraisal

18   of 8.86 million?

19        A   Right.

20        Q   Who did that appraisal?

21        A   A firm who's down out of Los Angeles did that.

22        Q   Do you know the name of the firm?

23        A   No, not offhand.  It was a couple years ago.  I

24   don't remember.

1          Q   And who commissioned that appraisal?

2          A   I don't know.  I'm not sure if it was Rockaway

3     Workforce or if it was Rockaway Affordable.  I can't

4     remember who commissioned that appraisal.  You're talking

5     who's on the cover letter; right?

6          Q   Presumably.

7          A   Yeah.  It might have been Rockaway Workforce as

8     well.  I'm not really sure.  It included those four

9     parcels.  That's why I say it might -- I mean, it might

10    have been Rockaway Affordable.  That's why I don't really

11    remember who commissioned it.

12         Q   Okay.  Do you have a copy of the appraisal?

13         A   Not with me I don't, no.

14         Q   Do you have a copy in your office or personal

15    possession?

16         A   Oh, yeah.  I can get you a copy, sure.

17         Q   Is that something your counsel can provide me

18    with?

19         A   Yeah.

20         Q   Okay.  Thank you.

21             And on the schedule listing the creditors,

22    you've listed Pacific Conservation, LLC.

23             Is it safe to assume that means Pacifica

24    Conservation?

1          A   Oh, yeah, yeah, yeah.

2          Q   Thank you.

3              And you've checked the box on here that says

4    the claim of Pacifica and of Seventeen on all the four

5    entities is disputed.

6              Can you describe the nature of that dispute for

7    me?

8          A   It's the $1 million conservation easement.

9          Q   Okay.

10         A   Settlement or fee, whatever it's called in the

11   purchase contract.

12         Q   You've scheduled one unsecured creditor, BKF

13   Engineers?

14         A   Correct.

15         Q   And who's your contact person with BKF?

16         A   I think it's probably Roland Haga.

17         Q   Roland Haga?

18         A   Haga, H-a-g-a.

19         Q   Okay.  And what did BKF Engineers do for

20   Rockaway Workforce Housing Partners?

21         A   They've done all the engineer's work for the

22   site so far.  I've got -- I've got some drawings you can

23   have.  It's just something -- I mean, there's --

24         Q   Have they been paid by anybody else?

1        A   Oh, yeah.

2        Q   Who else is paying their bill?

3        A   Rockaway Affordable was paying them; Rockaway

4    Highlands was paying them; Julia Ngo directly, their

5    architects, lawyers.  But, again, they weren't paid from

6    Rockaway Workforce, so...

7        Q   Okay.  And Rockaway Affordable, Rockaway

8    Highlands, and Ms. Ngo, are they jointly liable for the

9    debt owed to BKF Engineers?

10       A   I don't know.  I don't remember.  Not to be --

11   I don't recall.  They were -- it depends who's -- well,

12   they wouldn't be -- they wouldn't be now because I

13   believe that 27,000 is for the latest work I had done

14   which is for the -- all the engineer's work for the

15   Caltrans site to put in the roadways, draw up the

16   roadways and four-way intersection and the completed

17   pads.

18       Q   Okay.  Do you have an engagement with BKF

19   Engineers?

20       A   Probably somewhere, yeah.  I'll look for it.

21   There might be one.  I will tell you this much:  It's

22   just kind of -- the project has been rolling along for

23   almost three years with those guys, so I'm sure they're

24   not -- there's -- nobody's -- I don't know.  I'd be

1    surprised if there's an engagement letter that's really

2    right on point anymore, but I'll get you whatever there

3    is.

4         Q   Okay.  Schedule F -- I'm sorry -- Schedule H of

5    the bankruptcy schedules is something called co-debtors.

6    The note is made both by Rockaway Affordable and Rockaway

7    Workforce.

8         A   Right.

9         Q   Do you agree that Rockaway Affordable is a

10   co-debtor?

11        A   No.

12        Q   It's not?

13        A   No.  Because Rockaway Affordable had title to

14   the four parcels, which as of last September they

15   executed -- first of all, three of the parcels, when the

16   new note was done in December, Rockaway Affordable had

17   free and clear.  The fourth parcel that was in Rockaway

18   Affordable's name, they recorded a deed of reconveyance

19   for it in September of 2017 when they got the million

20   six, so they're gone.

21        Q   Was there a release of the note given to

22   Rockaway Affordable?

23        A   It's a nonrecourse note.  There's no liability.

24   I mean, if we sell the property, there's not even a

1    requirement that the buyer has to assume the note.  They

2    can take it subject to.  It says so right in the note.

3          Q   Have you ever been party to other litigation?

4          A   Yes.

5          Q   You personally?

6          A   Yes.

7          Q   How many cases?

8          A   I don't know.

9          Q   Okay.  Have you ever been charged criminally?

10         A   Yes.

11         Q   Have you been convicted?

12         A   Yes.

13         Q   In federal court?

14         A   Yes.

15         Q   I'm not sure you recognize it, but there's a

16    copy of an opinion from the U.S. Ninth Circuit Court of

17    Appeals.  Is that you, John A. Hickey?

18         A   Yes.

19         Q   Okay.  And do you know a Lee and Linda Vinker?

20         A   They were two limited partner investors that

21    were part of some real estate mortgage fund syndications

22    back in 1990.

23         Q   And do you owe a judgment to them?

24         A   To them?  I don't know.  There's a class action

1    judgment.

2            Q   Has that been paid?

3            A   No.

4            Q   Okay.

5            A   But I will say this:  The SEC shut down our

6    company in 1994 wrongfully.  Three years later I was

7    indicted, in 1997.  Eleven years after they took our

8    company over in 2005, I finally went to trial with

9    evidence destroyed, and I refused to do a plea deal so I

10   could defend myself, which was a sham going on in that

11   courtroom.  So all this stuff here, I don't -- it doesn't

12   make any difference what you bring up.

13           Q   Any other criminal convictions?

14           A   No.

15           Q   Any other judgments against you?

16           A   I don't -- I don't -- the restitution judgment

17   is the same as the -- it's the same as the class action.

18           Q   Have you satisfied the restitution judgment

19   from the federal conviction?

20           A   No.

21           Q   Have you satisfied the judgment in the class

22   action suit?

23           A   No.  They're one and the same.  No.  Well,

24   they're not -- they're a dollar-for-dollar offset.  Even

1    though they're differing amounts, it's the same thing.

2         Q   Okay.  I'd like to ask some questions based on

3    your prior testimony today.

4             Do you know the name of the person at Caltrans

5    that you've been dealing with?

6         A   Yes.  Bob McPherson.

7         Q   And where is he out of?

8         A   He works out of the Oakland office.  It's on

9    the -- if you look at the letter, it's on there.

10        Q   I have a Mark Weaver, but enough for now.

11        A   Mark Weaver is the current deputy district

12   director.  If you look, you will probably see -- he

13   didn't cc himself.  There's a 2009 letter that we

14   received from -- that we received from the secured

15   creditors, and they have -- that letter in there is from

16   Caltrans explaining the abutter's rights on the property,

17   so they gave it to us as part of our due diligence

18   material, and that is signed by Bob McPherson because he

19   was the deputy district director at the time.

20        Q   Fair enough.

21        A   But all my communications are really through

22   Bob McPherson because that's what Mark Weaver brought him

23   in to do.

24        Q   You said on the Caltrans parcel you have a

1    letter of intent from some sort of assisted living

2    company?

3          A    Correct.

4          Q    What's the name of that company?

5          A    Senior Housing Advisors.

6          Q    Where are they located?

7          A    I believe out of Portland, Oregon.  Yeah, I'm

8    pretty sure.

9          Q    And who's the person that you deal with there?

10         A    Steve Stubblefield.

11         Q    And is he also in Portland?

12         A    It's Lake Oswego, Oregon.  Yes, I believe so.

13         Q    Okay.  And when did they give you a letter of

14    intent for the best of your knowledge?

15         A    The last one was May 25th.

16         Q    Okay.  2009?

17         A    Yes.

18         Q    And is it binding?

19         A    No.  There was an earlier version, but they had

20    to clean it up, so they redid it on May 25th.  They're in

21    the process of putting a PSA together right now.

22              The reason I haven't executed a PSA agreement

23    with them to date is because of the outstanding issue

24    with the Caltrans, and so even though we've got

1    permission to file the plans with the City of Pacifica, I

2    don't want -- and they understand that fully, that

3    Caltrans still has the title to that property.  I'm a

4    little bit leery about executing a contract with them

5    before we have resolved the issue with Caltrans over

6    whether or not we've got to pay them, you know, a dollar

7    for their property, so that's where that's --

8           Q   Okay.  I heard you testify, I believe, that

9    you're bringing in a partner who has acquired 50 percent?

10   I'm sorry.  You didn't say very much about it, and so I

11   don't know that I can ask you.

12          A   We're bringing in West & Praszker,

13   P-r-a-s-z-k-e-r, Realtors, Inc.  They're taking a

14   50 percent interest, and they're going to be putting up

15   the funds for us to develop the Caltrans property and

16   move this forward.

17          Q   And how much are they paying for 50 percent

18   interest?

19          A   That's -- we don't know yet what their capital

20   requirements are going to be.  There's the $500,000

21   payment that your clients are owed, and there's

22   $1.8 million in another payment that's due on August 31st

23   so it's just -- it's not clear.

24          Q   Okay.  And where is West & --

1          A   They're in San Francisco, California.   They're

2     a real estate brokerage firm.

3          Q   Okay.

4          A   They also do some development.

5          Q   Okay.   And who do you deal with there?

6          A   Mike Klestoff, K-l-e-s-t-o-f-f.

7          Q   And --

8          A   They are the ones that put up -- they're the

9     ones that put up the $15,000 retainer for John White.

10         Q   And have you worked with this West & Praszker

11    before?

12         A   Yes.

13         Q   And when did you work with them?

14         A   They were a brokerage firm in San Francisco

15    that we had done business with.   They sold a number of

16    properties that my wife's family owned over the years.   I

17    mean, I've known them for probably 20 years.   I've known

18    Mike for probably that long, but in a brokerage capacity.

19         Q   Okay.   And do you have a written agreement with

20    West & Praszker?

21         A   Not at this time, no.

22         Q   And how do you know they're willing to become a

23    50 percent partner?

24         A   Because we've talked about it in Mike's office.

1          Q   Okay.  And when did you talk about it?

2          A   The last time we talked about this was either

3     last week or the week before.

4          Q   Okay.

5          A   And we talked about it before because they put

6     up the funds for John's retainer.

7               MR. BUBALA:  Okay.  I don't think I have any

8     other questions right now.

9               U.S. TRUSTEE STROZZA:  Okay.  I don't have

10    anything further.

11              Will that conclude the meeting of creditors?

12              MR. BUBALA:  Yes.

13              U.S. TRUSTEE STROZZA:  Thank you, and the

14    meeting is concluded.

15              (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

```
1    STATE OF NEVADA  )
                      )  ss.
2    COUNTY OF WASHOE )

3                I, PEGGY B. HOOGS, Certified Court Reporter

4    in and for the State of Nevada, do hereby certify:

5                That the foregoing transcript was prepared

6    from an audio recording of proceedings for which I was

7    not present; that the proceedings were reported

8    stenographically by me from the audio recording and

9    thereafter transcribed via computer under my supervision;

10   that the foregoing is a full, true and correct

11   transcription of the audio-recorded proceedings to the

12   best of my knowledge, skill and ability.

13               I further certify that I am not a relative nor

14   an employee of any attorney or any of the parties, nor am

15   I financially or otherwise interested in this action.

16               I declare under penalty of perjury under the

17   laws of the State of Nevada that the foregoing statements

18   are true and correct.

19               Dated this 5th day of July, 2017.

20

21               _____
                         Peggy B. Hoogs
22                       CCR #160, RDR, CRR

23

24
```