# EXHIBIT 3

# EXHIBIT 3



## APPRAISAL OF REAL PROPERTY

56.03 Acres of Vacant Land
North of Buel and Rockaway Beach Avenues
Pacifica, San Mateo County, CA 94044

### IN AN APPRAISAL REPORT

As of June 4, 2018

### Prepared For:

Seventeen Enterprises LLC and
PLC LLC
10168 North Price Ave
Fresno, CA 93730

### Prepared By:

Cushman & Wakefield Western, Inc.
Valuation & Advisory
49 Stevenson Street, 4th Floor
San Francisco, CA 94105
Cushman & Wakefield File ID: 18-38002-900366-001

CUSHMAN & WAKEFIELD WESTERN, INC.
49 STEVENSON STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105



**56.03 Acres of Vacant Land**

**North of Buel and Rockaway Beach Avenues**

**Pacifica, San Mateo County, CA 94044**



49 Stevenson Street, 4th Floor
San Francisco, CA 94105
Tel    +1 415.658.3698
cushmanwakefield.com

June 04, 2018

**Seventeen Enterprises LLC and
PLC LLC**
c/o Mr. Phil Weber
10168 North Price Ave
Fresno, CA 93730

Re:    Appraisal Report

**56.03 Acres of Vacant Land**
North of Buel and Rockaway Beach Avenues
Pacifica, San Mateo County, CA 94044

Cushman & Wakefield File ID:    18-38002-900366-001

Dear Mr. Weber:

In fulfillment of our Scope of Work agreement as outlined in the Letter of Engagement, we are pleased to transmit our appraisal of the above referenced property in the following Appraisal Report.

The subject property consists of an approximate 56.03 gross acre site that is presently in vacant, raw land condition. It has hillside topography that varies from rolling to steep with some areas that are level to provide future building pads.  The site is situated on the east side of Highway 1, north of Beal and Rockaway Beach Avenues in the southern end of the city of Pacifica, San Mateo County, California.  The subject property consists of one legal parcel that has no direct frontage on Highway 1.  However, title to the site includes legal rights of access from Highway 1 across an adjacent 5.692 acre parcel that is currently owned by CalTrans.  The property has General Plan and zoning designations that allow for residential development.

This Appraisal Report has been prepared in compliance with the *Uniform Standards of Professional Appraisal Practice (*USPAP*)* as well as the valuation requirements for charitable contributions under the Internal Revenue Service, Treasury Regulation §1.170-1(c).

Based on the agreed-to Scope of Work, and as outlined in the report, we developed the following opinion of Fair Market Value :

| Value Conclusion | | | |
|---|---|---|---|
| Appraisal Premise | Real Property Interest | Date Of Value | Value Conclusion |
| Fair Market Value As-Is | Fee Simple | June 04, 2018 | $4,950,000 |

*Compiled by Cushman & Wakefield Western, Inc.*

## Extraordinary Assumptions

For a definition of Extraordinary Assumptions please see the Glossary of Terms & Definitions. The use of extraordinary assumptions, if any, might have affected the assignment results.

This appraisal does not employ any extraordinary assumptions.

## Hypothetical Conditions

For a definition of Hypothetical Conditions please see the Glossary of Terms & Definitions. The use of hypothetical conditions, if any, might have affected the assignment results.

This appraisal does not employ any hypothetical conditions.

This letter is invalid as an opinion of value if detached from the report, which contains the text, exhibits, and Addenda.

Respectfully submitted,

**CUSHMAN & WAKEFIELD WESTERN, INC.**

Melissa J. Bach, MAI
Executive Director
CA Certified General Appraiser
License No. AG017144
Melissa.Bach@cushwake.com
(415) 658-3698 Office Direct

# Certification of Appraisal

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- We have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- Melissa J. Bach, MAI did make a personal inspection of the property that is the subject of this report.

- We have performed appraisal services regarding the property that is the subject of this report four times within the three-year period immediately preceding acceptance of this assignment.

- No one provided significant real property appraisal assistance to the persons signing this report.

- As of the date of this report, Melissa J. Bach, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

Melissa J. Bach, MAI
Executive Director
CA Certified General Appraiser
License No. AG017144
Melissa.Bach@cushwake.com
(415) 658-3698 Office Direct

# Summary of Salient Facts and Conclusions

## BASIC INFORMATION

| | |
|---|---|
| **Common Property Name:** | 56.03 Acres of Vacant Land |
| **Address:** | North of Buel and Rockaway Beach Avenues |
| | Pacifica, California 94044 |
| **County:** | San Mateo |
| **Property Ownership Entity:** | Rockaway Workforce Housing Partners LLC |

## SITE INFORMATION

| | **Square Feet** | **Acres** |
|---|---|---|
| **Land Area:** | 2,440,667 | 56.03 |
| **Site Shape:** | Irregularly shaped | |
| **Site Topography:** | Hilly | |
| **Frontage:** | Poor | |
| **Site Utility:** | Good | |

## MUNICIPAL INFORMATION

**Assessment Information:**

| | |
|---|---|
| **Assessing Authority** | San Mateo County |
| **Assessor's Parcel Identification** | 018-140-620 |
| **Current Tax Year** | 2017-18 |
| **Taxable Assessment** | $3,970,000 |
| **Current Tax Liability** | $45,197 |
| **Taxes per square foot** | $0.02 |
| **Are taxes current?** | Taxes are current |
| **Is a grievance underway?** | Not to our knowledge |

**Zoning Information:**

| | |
|---|---|
| **Municipality Governing Zoning** | City of Pacifica |
| **Current Zoning** | R-1/B-10 Single Family Residential Hillside (appr 52-53 acres); |
| | R-1/B-3 Single Family Residential/Min Lot Area 10,000 sf (appr 3-4 acres) |
| **Zoning Change Pending** | Not to our knowledge |
| **Zoning Variance Applied For** | Not to our knowledge |

## HIGHEST & BEST USE

**As Vacant:**

development with residential use with total number of lots as allowed by zoning

| VALUATION INDICES | Market Value As-Is |
|---|---|
| **VALUE DATE** | **June 4, 2018** |
| **Land Value** | |
| Indicated Value: | $4,950,000 |
| Per Unit: | $450,000 |
| Per Site Square Foot | $2.03 |
| **FINAL VALUE CONCLUSION** | |
| Real Property Interest: | Fee Simple |
| Concluded Value: | $4,950,000 |
| Per Unit: | $450,000 |
| **EXPOSURE AND MARKETING TIMES** | |
| **Exposure Time:** | 9-12 Months |
| **Marketing Time:** | 9-12 Months |

## Extraordinary Assumptions

For a definition of Extraordinary Assumptions please see the Glossary of Terms & Definitions. The use of extraordinary assumptions, if any, might have affected the assignment results.

This appraisal does not employ any extraordinary assumptions.

## Hypothetical Conditions

For a definition of Hypothetical Conditions please see the Glossary of Terms & Definitions. The use of hypothetical conditions, if any, might have affected the assignment results.

This appraisal does not employ any hypothetical conditions.

# Property Photographs

**AERIAL PHOTOGRAPH**



**ROUGH ROADWAY ONTO SUBJECT AT SW END FROM ADJ PARCEL**



**POTENTIAL BUILDING PAD AREA ON SUBJECT SITE**



**LOWER LEVELS OF SUBJECT SITE**



**ADDITIONAL POTENTIAL DEVELOPMENT PAD ON SUBJECT SITE**



**VIEWS W FROM LOWER PORTION OF SUBJECT SITE**



**ROUGH CUT ROAD TO UPPER PORTION OF SUBJECT PROPERTY**



**VIEW W FROM UPPER PORTION OF SUBJECT PROPERTY**



**ROUGHT CUT ROAD AND LEVEL PAD AREA ON UPPER PORTION OF SUBJECT SITE**



**HWY 1 FRONTAGE AND POTENTIAL FUTURE ACCESS POINT TO SUBJECT FROM CALTRANS PARCEL**



# Table of Contents

Summary of Salient Facts and Conclusions ...................................................................................................6
Property Photographs ....................................................................................................................................8
Scope of Work..............................................................................................................................................15
    Overview ...............................................................................................................................................15
    Report Option Description .....................................................................................................................16
    Identification Of Property ......................................................................................................................17
    Property Ownership And Recent History ..............................................................................................17
    Dates Of Inspection And Valuation ......................................................................................................17
    Clients, Intended Use And Users Of The Appraisal .............................................................................18
Regional Analysis.........................................................................................................................................19
Local Area Analysis......................................................................................................................................25
Local Housing Market Overview ..................................................................................................................29
Property Analysis .........................................................................................................................................33
    Site Description .....................................................................................................................................33
    Real Property Taxes and Assessments ..................................................................................................36
    General Plan and Zoning .......................................................................................................................38
Valuation ......................................................................................................................................................42
    Highest and Best Use ............................................................................................................................42
    Valuation Process ..................................................................................................................................44
    Land Valuation ......................................................................................................................................46
    Final Value Opinion ..............................................................................................................................55
    Assumptions and Limiting Conditions ..................................................................................................56
Addenda Contents ........................................................................................................................................58

# Scope of Work

## Overview

Scope of work is the type and extent of research and analyses involved in an assignment.  To determine the appropriate scope of work for the assignment, we considered the intended use of the appraisal, the needs of the user, the relevant characteristics of the subject property, and other pertinent factors.  Our concluded scope of work is summarized below, and in some instances, additional scope details are included in the appropriate sections of the report:

### Research

- We inspected the property and its environs.  Additional physical information on the subject was obtained from public records, and/or third-party sources.
- Regional economic and demographic trends, as well as the specifics of the subject's local area were investigated.  Data on the local and regional property market (supply and demand trends, etc.) was also obtained.  This process was based on interviews with regional and/or local market participants, primary research, available published data, and other various resources.
- Other relevant data was collected, verified, and analyzed.  Comparable property data was obtained from various sources (public records, third-party data-reporting services, etc.) and confirmed with a party to the transaction (buyer, seller, broker, owner, etc.) wherever possible.  It is, however, sometimes necessary to rely on other sources deemed reliable, such as data reporting services.

### Analysis

- Based upon the subject property characteristics, prevailing market dynamics, and other information, we developed an opinion of the property's Highest and Best Use.
- We analyzed the data gathered using generally accepted appraisal methodology to arrive at a probable value indication via the applicable approach to value.

This report is intended to comply with the reporting requirements outlined under USPAP for an Appraisal Report.

This appraisal employs only the Sales Comparison Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that this approach would be considered necessary and applicable by market participants. Typical purchasers do not generally rely on the Cost or Income Capitalization Approaches when purchasing a property such as the subject of this report. Therefore, we have not employed the Cost Approach or the Income Capitalization Approach to develop an opinion of market value. The absence of these approaches does not diminish the reliability of the analysis.

# Report Option Description

USPAP identifies two written report options: Appraisal Report and Restricted Appraisal Report. This document is prepared as an Appraisal Report in accordance with USPAP guidelines. The terms "describe," summarize," and "state" connote different levels of detail, with "describe" as the most comprehensive approach and "state" as the least detailed. As such, the following provides specific descriptions about the level of detail and explanation included within the report:

- Describes the real estate and/or personal property that is the subject of the appraisal, including physical, economic, and other characteristics that are relevant
- States the type and definition of value and its source
- Describes the Scope of Work used to develop the appraisal
- Describes the information analyzed, the appraisal methods used, and the reasoning supporting the analyses and opinions; explains the exclusion of any valuation approaches
- States the use of the property as of the valuation date
- Describes the rationale for the Highest and Best Use opinion

## Identification Of Property

| | |
|---|---|
| Common Property Name: | 56.03 Acres of Vacant Land |
| Location: | North of Buel and Rockaway Beach Avenues |
| | Pacifica, San Mateo County, California 94044 |
| Assessor's Parcel Number: | 018-140-620 |
| Legal Description: | The legal description is presented in the Addenda of the report. |

## Property Ownership And Recent History

| | |
|---|---|
| Current Ownership: | Rockaway Workforce Housing Partners LLC |
| Sale History: | The property was purchased by the current owner on August 31, 2016 from Pacific Land Conservation, LLC for $4,780,270, which included $280,020 in escrow extension payments. The seller reportedly provided financing to the buyer, although no terms of this seller-financing were provided to the appraiser. |
| | The previous owner purchased the property out of bankruptcy proceedings for $1,000,000 in 2010. No other transfers of the subject property occurred in the past five years. |
| Current Disposition: | To the best of our knowledge, the property is not being marketed for sale. |

## Dates Of Inspection And Valuation

| | |
|---|---|
| Effective Date of Valuation: | |
| As Is: | June 4, 2018 |
| Date of Report: | June 04, 2018 |
| Date of Inspection: | June 4, 2018 |
| Property Inspected by: | Melissa J. Bach, MAI |

## Clients, Intended Use And Users Of The Appraisal

| | |
|---|---|
| Clients: | Seventeen Enterprises LLC and PLC LLC |
| Intended Use: | This appraisal is intended to provide an opinion of the Market Value of the Fee Simple interest in the property in as-is condition for the use of the Clients and their legal representation in regards to determining value for foreclosure proceedings affecting the subject property. This report is not intended for any other use. |
| Intended Users: | This appraisal report was prepared for the exclusive use of Seventeen Enterprises LLC and PLC LLC, as well as their legal representation for the above intended use. Use of this report by others is not intended by the appraiser. |

56.03 ACRES OF VACANT LAND

REGIONAL ANALYSIS

# Regional Analysis

**REGIONAL MAP**



# Greater Silicon Valley Regional Analysis

## Introduction

### Market Definition

Silicon Valley encompasses 1,740 square miles of land and is comprised of San Mateo County and Santa Clara County. San Mateo County is essentially the peninsula formed by the San Francisco Bay and the Pacific Ocean (save for the City and County of San Francisco at its northern tip). Santa Clara County lies at the south end of the San Francisco Bay and is much larger geographically than San Mateo County. Silicon Valley is part of the greater San Jose-San Francisco-Oakland Consolidated Metropolitan Statistical Area (CSA).

### Current Trends

Silicon Valley continues to be one of the nation's strongest economies. According to the current Moody's Analytics' San Jose metro report, "Technology companies will keep San Jose humming in 2018. Tech is the lifeblood of the economy, generating income, creating demand for office space and housing, and galvanizing consumer-oriented services."

## Demographic Trends

### Demographic Characteristics

Both Santa Clara and San Mateo Counties are considered highly desirable but expensive places to live, which is reflected in the region's demographics. Moody's Analytics reports that the cost of living in San Jose is 67.0 percent higher when compared to the U.S. Additionally, Silicon Valley differs in demographic aspects relative to U.S. income and education levels. Because of the region's innovation and high-tech industry, it is recognized as having one of the most educated populace in the nation.

The following chart compares the demographic characteristics of Silicon Valley with the demographic characteristics of the United States:

| Demographic Characteristics Silicon Valley vs. United States 2017 Estimates | | |
| --- | --- | --- |
| Characteristic | Silicon Valley | United States |
| Median Age (years) | 38.0 | 38.0 |
| Average Annual Household Income | $150,700 | $81,217 |
| Median Annual Household Income | $107,143 | $56,286 |
| *Households by Annual Income Level:* | | |
| <$25,000 | 11.2% | 22.2% |
| $25,000 to $49,999 | 13.1% | 22.8% |
| $50,000 to $74,999 | 11.9% | 18.2% |
| $75,000 to $99,999 | 10.5% | 12.6% |
| $100,000 plus | 53.4% | 24.3% |
| *Education Breakdown:* | | |
| < High School | 12.8% | 13.6% |
| High School Graduate | 15.8% | 27.9% |
| College < Bachelor Degree | 24.7% | 29.0% |
| Bachelor Degree | 26.3% | 18.4% |
| Advanced Degree | 20.4% | 11.0% |

Source: © 2017 Experian Marketing Solutions, Inc. •All rights reserved•
Cushman & Wakefield Valuation & Advisory

## Population

Silicon Valley, with a population of roughly 2.7 million, significantly surpassed U.S. growth from 2008 through 2016. Data suggests that during the forecast period, population growth will fall below U.S. growth, as higher costs of living and doing business factor into population growth in the region. Over the long term, the region is expected to continue to attract highly educated workers due to its strong technology and innovation industries. Another lure is its proximity to the Bay Area's desirable amenities and lifestyles.

Further highlights are as follows:

- Silicon Valley's average annual growth rate between 2006 and 2016 of 1.2 percent was well-above the 0.8 percent average annual population growth rate for the U.S.

- Silicon Valley's average annual population growth is forecast to be 0.5 percent over the next five years, slightly below the U.S. average annual growth of 0.7 percent.

The following table shows Silicon Valley's annualized population growth:

| Annualized Population Growth by County Silicon Valley vs. San Francisco CSA Counties 2006-2021 | | | | | | |
|---|---|---|---|---|---|---|
| Population (000's) | 2006 | 2016 | Forecast 2017 | Forecast 2021 | Compound Annual Growth Rate 06-16 | Compound Annual Growth Rate 17-21 |
| United States | 298,379.9 | 323,127.5 | 325,432.5 | 334,074.7 | 0.8% | 0.7% |
| San Jose-San Francisco-Oakland CSA | 7,150.7 | 8,018.1 | 8,051.2 | 8,247.4 | 1.2% | 0.6% |
| **Silicon Valley** | **2,381.3** | **2,684.2** | **2,688.2** | **2,745.3** | **1.2%** | **0.5%** |
| **Santa Clara County** | **1,691.2** | **1,919.4** | **1,921.6** | **1,964.0** | **1.3%** | **0.5%** |
| **San Mateo County** | **690.2** | **764.8** | **766.6** | **781.4** | **1.0%** | **0.5%** |
| Alameda County | 1,444.5 | 1,647.7 | 1,658.7 | 1,710.4 | 1.3% | 0.8% |
| Contra Costa County | 1,000.8 | 1,135.1 | 1,141.9 | 1,171.3 | 1.3% | 0.6% |
| San Francisco County | 768.7 | 870.9 | 874.5 | 902.0 | 1.3% | 0.8% |
| Sonoma County | 465.2 | 503.1 | 504.1 | 508.0 | 0.8% | 0.2% |
| Solano County | 408.4 | 440.2 | 443.5 | 456.1 | 0.8% | 0.7% |
| Santa Cruz County | 251.6 | 274.7 | 275.8 | 279.9 | 0.9% | 0.4% |
| Marin County | 244.6 | 260.7 | 262.3 | 269.0 | 0.6% | 0.6% |
| Napa County | 131.4 | 142.2 | 142.7 | 144.5 | 0.8% | 0.3% |
| San Benito County | 54.1 | 59.4 | 59.5 | 60.8 | 0.9% | 0.6% |

Source: Data Courtesy of Moody's Analytics, Cushman & Wakefield Valuation & Advisory

## Economic Trends

### Employment Distribution

Silicon Valley's employment base is less diversified than the U.S. The most prominent employment sector in Silicon Valley, professional and business services, accounts for 20.9 percent of employment, compared to 14.2 percent for the U.S. Manufacturing employment accounts for 12.9 percent of all employment within Silicon Valley, compared to 8.5 percent for the nation. The information sector, also more heavily weighted than the U.S., accounts for 7.6 percent of all employment in Silicon Valley, versus 1.9 percent for the nation. Each of these sectors locally has substantial high-tech components, which as noted, is the region's most concentrated area of economic activity. As such, Silicon Valley tends to exhibit more volatile growth than do more economically diversified markets.

Further considerations are as follows:

- Though less weighted, the education and health services sector had steady job growth, posting 5.5 percent year-over-year in December 2017, adding 9,100 jobs.
- Another less weighted sector, leisure and hospitality, posted job growth of 7.6 percent year-over-year in December 2017, adding 7,700 jobs, and posted the second highest growth in all sectors during that time.

### Employment Growth

Although employment growth in Silicon Valley over the last decade was modest during the first half, job growth picked up momentum during the second half, exceeding growth in the United States. Job losses in the Silicon Valley region accelerated during and after the recession, however prior to 2008, and after 2010, the region's job growth greatly surpassed the U.S. employment growth. Silicon Valley's annual average employment growth was 3.6 percent between 2011 and 2016, the most in a decade, with some sectors experiencing sizeable employment gains. Currently, year-over-year employment growth in the leisure and hospitality, education and health services and

information sectors were the most significant at 7.6, 5.5 and 4.8 percent. As noted, job growth picked up steam in the second half of 2017.

Further considerations are as follows:

- Between 2006 and 2016, Silicon Valley's total non-farm employment increased at an average annual rate of 1.7 percent; the nation's growth was 0.6 percent over the same time period.

- Silicon Valley employment is forecast to continue to be slow, with an annual average rate of 0.7 percent from 2017 to 2021, matching 0.7 percent growth forecast for the United States.

The following graph illustrates total non-farm employment growth per year, for Silicon Valley and the U.S.:



Source: Data Courtesy of Moody's Analytics and Cushman & Wakefield Valuation & Advisory
Note: Shaded bars indicate periods of recession

## Conclusion

Silicon Valley's economy is one of the strongest metros in the nation, aided by high-value-added technology services, rising payrolls, and healthy consumer confidence. Worth noting, however, are rising labor and land costs in the region, leading some companies to seek less expensive locations within the state, and others to relocate outside California, where there are tech workforces such as Utah, Washington and Oregon. Moody's Analytics noted in the year-end 2017 San Jose metro report, "San Jose-Sunnyvale-Santa Clara's exceptionally talented workforce, ability to attract capital, and legacy of entrepreneurship will guide it through a period of adjustment to high costs. San Jose will handily outperform the U.S. over the forecast horizon." Although technology will continue to be dominant in the region's economy, growth from other sectors has increased as well and is expected to continue to boost the economy.

Additional highlights follow:

- According to PwC and ULI's *Emerging Trends in Real Estate 2018*, San Jose is ranked eighth (a rise from 17th in 2017) nationally in markets to watch for overall real estate prospects in their top 20 markets surveyed. The report notes that San Jose can boast not only a highly educated workforce, but also significant density of talent which allows for spin-off and creation of new companies. Challenges include the lack affordable housing as an issue that could have negative impact on future growth.

- Ramped up commercial construction has benefited the economy. Noted Moody's Analytics, "Strong technology company demand for office space will ensure that construction remains a key driver of San Jose's expansion. Google has proposed an 8.0-million square foot campus in downtown San Jose. Demand and permitting there have been very strong over the past two years after being virtually dormant since the Great Recession. Moreover, construction has begun to revamp Microsoft's campus in Mountain View. The company will demolish three of its five buildings, renovate the other two, and build a new one. Microsoft and Google's office plans come after Apple finished construction on its spaceship campus earlier in 2017."

# Local Area Analysis

## LOCAL AREA MAP



# Location Overview

The property is located in the city of Pacifica in northwestern San Mateo County. Generally, the local area comprises a mixture of commercial uses located along Highway 1 and Linda Mar Boulevard, with residential uses located along secondary roadways.

# Neighborhood Analysis

The City of Pacifica was incorporated in 1957.  It is located on the Pacific Coast and is approximately 70 percent built-up.  The majority of businesses in the area are devoted to neighborhood serving commercial uses.  Pacifica is a coastal city that serves as a suburb for the major employment centers of San Francisco and Silicon Valley.  It is a desirable residential location due to its proximity to recreational venues and employment centers.

Estimates within the local area are published by Experian, Inc.  Demographic information for the subject area, compared with a one-, three- and five-mile radius, as well as the San Francisco-Oakland CBSA, the state of California and the nation, are shown on the following tables.

| DEMOGRAPHIC SUMMARY | | | | | | |
|---|---|---|---|---|---|---|
| | 1.0-Mile Radius | 3.0-Mile Radius | 5.0-Mile Radius | San Francisco-Oakland CBSA | State of California | United States |
| **POPULATION STATISTICS** | | | | | | |
| 2000 | 5,022 | 51,414 | 176,265 | 4,121,092 | 33,859,695 | 281,422,025 |
| 2017 | 5,243 | 50,383 | 188,787 | 4,687,286 | 39,597,702 | 325,227,741 |
| 2022 | 5,299 | 50,345 | 188,236 | 4,780,055 | 40,879,765 | 338,317,173 |
| Compound Annual Change | | | | | | |
| 2000 - 2017 | 0.25% | -0.12% | 0.40% | 0.76% | 0.93% | 0.85% |
| 2017 - 2022 | 0.21% | -0.02% | -0.06% | 0.39% | 0.64% | 0.79% |
| **HOUSEHOLD STATISTICS** | | | | | | |
| 2000 | 1,879 | 18,567 | 61,079 | 1,550,882 | 11,498,173 | 105,480,443 |
| 2017 | 2,012 | 17,944 | 65,377 | 1,756,889 | 13,391,675 | 122,737,174 |
| 2022 | 2,046 | 18,144 | 66,750 | 1,822,280 | 14,071,529 | 129,506,301 |
| Compound Annual Change | | | | | | |
| 2000 - 2017 | 0.40% | -0.20% | 0.40% | 0.74% | 0.90% | 0.90% |
| 2017 - 2022 | 0.34% | 0.22% | 0.42% | 0.73% | 1.00% | 1.08% |
| **AVERAGE HOUSEHOLD INCOME** | | | | | | |
| 2000 | $83,919 | $82,152 | $77,672 | $83,412 | $65,671 | $56,675 |
| 2017 | $156,913 | $145,879 | $129,861 | $130,365 | $97,218 | $81,217 |
| 2022 | $186,162 | $173,240 | $154,127 | $151,022 | $111,306 | $93,376 |
| Compound Annual Change | | | | | | |
| 2000 - 2017 | 3.75% | 3.44% | 3.07% | 2.66% | 2.33% | 2.14% |
| 2017 - 2022 | 3.48% | 3.50% | 3.49% | 2.99% | 2.74% | 2.83% |
| **OCCUPANCY** | | | | | | |
| Owner Occupied | 78.94% | 73.01% | 62.41% | 52.90% | 54.01% | 63.60% |
| Renter Occupied | 21.06% | 26.99% | 37.59% | 47.10% | 45.99% | 36.40% |

SOURCE: © 2017 Experian Marketing Solutions, Inc. •All rights reserved

## DISTRIBUTION OF HOUSEHOLD INCOME

| Category | 1.0-Mile Radius | 3.0-Mile Radius | 5.0-Mile Radius | San Francisco-Oakland CBSA | State of California | United States |
|---|---|---|---|---|---|---|
| $150,000 or more | 35.74% | 30.69% | 25.05% | 25.95% | 15.60% | 10.62% |
| $125,000 to $149,999 | 12.28% | 14.04% | 11.49% | 8.02% | 6.17% | 5.05% |
| $100,000 to $124,999 | 14.36% | 13.34% | 13.71% | 11.23% | 9.64% | 8.59% |
| $75,000 to $99,999 | 10.29% | 11.12% | 12.57% | 11.87% | 12.60% | 12.58% |
| $50,000 to $74,999 | 11.28% | 12.08% | 13.75% | 13.21% | 16.51% | 18.18% |
| $35,000 to $49,999 | 4.97% | 6.50% | 8.57% | 8.78% | 11.58% | 13.11% |
| $25,000 to $34,999 | 4.57% | 4.38% | 5.13% | 6.04% | 8.47% | 9.71% |
| $15,000 to $24,999 | 3.83% | 3.92% | 4.73% | 6.39% | 9.04% | 10.18% |
| Under $15,000 | 2.68% | 3.92% | 5.00% | 8.50% | 10.39% | 11.98% |

SOURCE: © 2017 Experian Marketing Solutions, Inc. •All rights reserved

## CONSUMER EXPENDITURES IN 000s

| Area | 2017 | 2022 | CAGR 2017-22 |
|---|---|---|---|
| 1.0-Mile Radius | $180,479 | $204,881 | 2.6% |
| 3.0-Mile Radius | $1,585,459 | $1,805,736 | 2.6% |
| 5.0-Mile Radius | $5,508,632 | $6,352,717 | 2.9% |
| San Francisco-Oakland ( | $135,174,152 | $159,489,866 | 3.4% |
| State of California | $899,552,641 | $1,089,933,404 | 3.9% |
| United States | $7,277,009,469 | $8,907,850,950 | 4.1% |

SOURCE: © 2017 Experian Marketing Solutions, Inc. •All rights reserved

## HOUSING SUMMARY

| | 1.0-Mile Radius | 3.0-Mile Radius | 5.0-Mile Radius | San Francisco-Oakland CBSA | State of California | United States |
|---|---|---|---|---|---|---|
| **HOUSING STATISTICS** | | | | | | |
| 2017 Est. Total Housing Units | 2,013 | 17,977 | 65,448 | 1,791,976 | 14,046,055 | 135,886,619 |
| 2017 Est. Median Housing Value | $781,189 | $754,464 | $719,997 | $664,403 | $415,406 | $193,953 |
| 2017 Est. Median Year Built | 1964 | 1964 | 1964 | 1966 | 1974 | 1977 |

SOURCE: © 2017 Experian Marketing Solutions, Inc. •All rights reserved

## Nearby and Adjacent Uses

The subject's local area is composed of a mixture of retail and service commercial on the main roadways, with residential development concentrated on the local feeder streets.

The immediate adjacent uses to the subject property are as follows:

| North | - | Single Family Residences (on streets on the south side of Reina del Mar Avenue) |
|---|---|---|
| East | - | Undeveloped hillsides |
| South | - | Single Family Residences on the north side of Rockaway Beach Avenue |
| West | - | House of worship, Highway 1 (Cabrillo Highway) and undeveloped land on west side of Highway 1 |

**Special Hazards or Adverse Influences**

We observed no detrimental influences in the local market area, such as landfills, flood areas, noisy or air polluting industrial plants, or chemical factories.

**Land Use Changes**

We are not aware of any significant land use changes which would have a direct impact on the subject property. However, development of the subject property would require public roadway access and improvements, as will be discussed in a later chapter.

## Access

Local area accessibility is generally good, relying on the following transportation arteries:

Local:                          North-South access throughout the local area is provided by Highway 1. East-West access through the local area is provided by Sharp Park Road near the center of the city.  Fassler and Rockaway Beach Avenues provide east-west access in the subject's greater neighborhood between the east and west sides of Highway 1.

Regional:                       Highway 1 is to the west of the subject.  This scenic highway runs along the Pacific Ocean and connects San Francisco to Half Moon Bay and Santa Cruz to the south. Highway 101 is located approximately 5 miles east of the subject.  Highway 101 is the primary arterial between San Francisco and San Jose.  It courses northward through the States of Oregon and Washington and southward to Los Angeles.

The Sam Trans municipal bus system serves the greater subject neighborhood.  However, the primary form of transportation is by private vehicle.

## Conclusion

The local area is a stable residential district within a suburban San Francisco community located proximate to employment, transportation systems, and recreational amenities.  Although there is undeveloped land in the area, most of it is allocated towards open space or low density residential development.

The subject's location proximate to employment, public facilities, and transportation routes provides a good environment in which to live.  These factors should contribute to the long-term attractiveness and viability of the subject property with those uses allowed under land use regulations.

# Local Housing Market Overview

## Home Prices – Bay Area

The housing market within San Mateo County has historically included a mix of single-family attached and detached housing. According to State Department of Finance figures, just over half of all housing units in the County are single family detached. Available land has led to significant expansion of the detached housing base in the eastern portion of the County. In recent years, the new construction in the County has been a mix of single family detached units and attached units in periphery areas and in-fill sites. The following table provides Bay Area median home prices for the six-month period between October 2017 and March 2018, along with the corresponding year over year change reported by CoreLogic DataQuick.

| MONTH/YEAR | BAY AREA MEDIAN PRICE | YEAR-OVER-YEAR CHANGE |
|---|---|---|
| Mar 2018 | $820,000 | 14.7% |
| Feb 2018 | $750,000 | 12.5% |
| Jan 2018 | $710,000 | 12.7% |
| Dec 2017 | $750,000 | 12.1% |
| Nov 2017 | $787,000 | 12.6% |
| Oct 2017 | $765,000 | 10.9% |

*Source: CoreLogic DataQuick*

As of March 2018, the median price in the Bay Area had increased 14.7 percent year-over-year to $820,000. Between October 2017 and February 2018 the median price decreased 1.98 percent. However, the $820,000 median price paid for all homes sold in the San Francisco Bay Area was a record, with the region's prior peak median having been $784,000 in November 2017. March 2018 marked the 72nd consecutive month of year-over-year median sales price increases for the Bay Area. In the past six months, the median home price in the Bay Area has increased at a higher rate month-over-month (7.2 percent) than the average annual gain of 6.4 percent observed during the same period last year.

In his company's report regarding March 2018 data, CoreLogic research analyst Andrew LePage stated, "The Bay Area has experienced some of the state's strongest home price growth throughout the past year, but last month's 14.7 percent year-over-year increase in the median sale price also reflects a change in market mix, where a higher share of transactions is occurring in mid- to high-priced markets. Similarly, the March 2018 medians in Marin, Santa Clara and San Mateo counties jumped between 23 percent and nearly 34 percent year over year as a greater share of activity occurred in the higher price ranges. That's at least partly because the inventory of more affordable homes is so limited in those counties.

He added, "The rise in home prices and, more recently ,mortgage rates means homebuyers face significantly higher mortgage payments, helping to spur interest in adjustable-rate mortgages, or 'ARMs,' which have lower initial rates and payments. ARMs made up 25 percent of the region's home purchase loans in March, up from just under 23 percent a year early, while in Santa Clara County 41 percent of last month's purchase loans were ARMs, up from about 34 percent in March 2017."

The level of distressed property sales has decreased significantly in recent years. The following table indicates the percentage of resales representing distressed sales that transferred for the months of March 2017 and March 2018 for the Bay Area, as reported by CoreLogic DataQuick.

| PROPERTY TYPE | % OF OVERALL SALES FOR MARCH 2017 | % OF OVERALL SALES FOR MARCH 2018 |
|---|---|---|
| Distressed Sales | 1.7% | 1.0% |

*Source: CoreLogic DataQuick*

Overall, distressed sales (foreclosures and short sales combined) consisted of approximately 1.0 percent of all resales in March 2018. The level of distressed sales declined from approximately 1.7 percent just one year ago. Distressed sales peaked in January 2009 at 60 percent of resales.

Absentee buyers – mostly investors, but also second-home buyers – bought 19.6 percent of all Bay Area homes sold in March 2018, down from 21.0 percent in February 2018 and up from 18.1 percent in March 2017. The peak absentee share was 28.4 percent in February 2013 and has averaged approximately 15.0 percent monthly since 1988.

Government-insured Federal Housing Administration (FHA) loans accounted for 5.0 percent of home purchase loans in the Bay Area in March 2018, down from 8.3 percent in February 2018 and 12.9 percent in March 2017. FHA loans with low down payment options were higher in more affordable areas in March 2018 such as Solano County at 14.9 percent, Contra Costa County at 11.4 percent and Napa County at 11.0 percent.

Additionally, home sales of $500,000 or more accounted for 77.7 percent of all sales in March 2018, up from 73.3 percent in February 2018 and up from 72.1 percent in March 2017.

The above statistics illustrate the overall strength of the Bay Area housing market.

## Sales Volume – Bay Area

The following table provides Bay Area sales volume for the six-month period between October 2017 and March 2018, along with the corresponding year-over-year change reported by CoreLogic DataQuick.

| MONTH/YEAR | BAY AREA SALES VOLUME | YEAR-OVER-YEAR CHANGE |
|---|---|---|
| Mar 2018 | 7,122 | -3.3% |
| Feb 2018 | 4,929 | 1.9% |
| Jan 2018 | 4,503 | -7.1% |
| Dec 2017 | 6,825 | -3.9% |
| Nov 2017 | 7,268 | -2.7% |
| Oct 2017 | 7,492 | -0.8% |

*Source: CoreLogic DataQuick*

The March 2018 sales volume represents a 43.9 percent increase from February 2018 and a 3.3 percent decrease year-over-year. The recent sales volume was 17.1 percent below the monthly average of 8,590 sales reported since

1988. CoreLogic DataQuick reports that home sales have generally increased 39.8 percent on average annually between February and March since 1988.

New construction sales of attached and detached homes were 27.1 percent below the long-term average reported for March. The decrease is reported as the result of limited new home inventory and not a decrease in market conditions.

## Pacifica Residential For-Sale Market

The table below shows median resale pricing trends for the City of Pacifica and San Mateo County, as well as the year-over-year changes from the same month one year prior. This data spans the six-month period between October 2017 and March 2018.

|  | PACIFICA MEDIAN PRICE | % CHG FROM PREVIOUS YEAR | SAN MATEO COUNTY MEDIAN PRICE | % CHG FROM PREVIOUS YEAR |
|---|---|---|---|---|
| Mar 2018 | $1,011,500 | 15.6% | $1,320,000 | 25.7% |
| Feb 2018 | N/A | N/A | $1,265,000 | 23.1% |
| Jan 2018 | $935,000 | 18.7% | $1,215,000 | 30.6% |
| Dec 2017 | $904,000 | 11.6% | $1,200,500 | 19.1% |
| Nov 2017 | $905,000 | 6.5% | $1,275,000 | 25.0% |
| Oct 2017 | $965,000 | 18.4% | $1,220,000 | 16.2% |

*Source: CoreLogic DataQuick*

According to statistics compiled by CoreLogic DataQuick, the year-over-year median price in San Mateo County has increased year-over-year for the past six months. Median prices in the City of Pacifica have generally increased year-over-year during the same period although at a lower level than the county. This trend demonstrates the continued strength of the housing market overall. The median home price in San Mateo County has historically been higher than the City of Pacifica. Data for February 2018 was not available for the City of Pacifica.

## Residential Supply and Demand

The City of Pacifica is a coastal community on the San Francisco Peninsula. It is within commuting distance to Silicon Valley to the south, and the City of San Francisco to the north. According to the DOF, in the 10-year period between January of 2005 and 2015, the city added 164 residential units, for a nearly 1.1 percent increase in the total housing inventory. As of January 1, 2017, there were 14,510 total housing units within the City. Approximately 71 percent of the total housing stock in the City consisted of detached single family residences, while 7 percent were attached single family homes. Multifamily units accounted for 21 percent of the housing stock. The remaining units consisted of mobile homes.

There are a number of in-fill development projects and coastal land developments sites proposed or in the pipeline for development within the City of Pacifica. This includes the Quarry Site north of Rockaway Beach which is proposed for development with multi-family residential, a hotel, single family residential lots, and commercial improvements, as well as public open space.

The most recent new home development is Harmony One, a 10-lot residential subdivision in a gated community. The original 53 acre parcel was subdivided into 10 residential lots with approximately 26 acres of permanent open space dedicated in a conservation easement.  These lots commenced sales in 2014 to end buyers.  However, as of the date of value, only one of the lots has completed a single family residence, three of the lots sold but the

plans with the City for the proposed houses have all been suspended and one lot presently has the proposed house plan in the City's planning process with no approvals in place.

It should be noted that in October 2017, Governor Brown signed several bills into law that expand requirements for cities and counties in California to plan for housing, push residential developers to build and preserve more low-income housing units, and provide the state housing department to investigate and penalize cities and counties that don't follow through with their reported housing plans. All of these recently signed bills appear aimed at easing development of residential units in the state (both market-rate and affordable) in order to start to address the demand from population growth.  However, it should be noted that the impact of these new laws and the actual effects is not known as of the date of value.

## Conclusion

Overall, based on the analysis of the subject property development, and considering the current market conditions and economic forecasts, the short-term outlook for the subject property as a residential development site is considered to be positive. There is potential for a long-term positive outlook based on continued improvement in the residential market with increasing sale prices observed as overall inventory normalizes.

# Property Analysis

## Site Description

| | |
|---|---|
| Location: | North of Buel and Rockaway Beach Avenues |
| | Pacifica, San Mateo County, California 94044 |
| | The subject property is situated on the east side of Highway 1, north of Buel and Rockaway Beach Avenues in the southern portion of the city.  While it has no direct frontage on Highway 1, it has access rights from Highway 1 over an adjacent parcel owned by CalTrans. |
| Shape: | Irregularly shaped |
| Topography: | Hillsides ranging from rolling to steep |
| Land Area: | 56.03 gross acres / 2,440,667 square feet |
| Frontage: | The subject property has poor frontage as it lacks any direct frontage along Highway 1 or another public roadway. |
| Access: | The subject property has average access. |
| Rights of Access: | The appraiser was provided with documents between the California Department of Transportation (CalTrans, as Grantee) and representatives of the then-property owner of the subject parcel.  CalTrans acquired a 5.692 acre parcel that fronts Highway 1 in 1972 from Robert A. Tarver, et al, (Grantor) the property owner of the subject site as of that date.  The grant deed stated that "this conveyance is made for the purposes of a freeway and adjacent frontage road and the grantor herby releases and relinquishes to the grantee any and all abutter's rights, including access rights, appurtenant to grantor's remaining property in and to said freeway, provided, however, that such remaining property shall abut upon and have access to said frontage road which will be connected to the freeway only at such points as may be established by public authority." |
| | The intent of the clause has been acknowledged by CalTrans in a 2009 letter to the property owner that the Grantor would continue to have access to Highway 1 or direct access to a frontage road constructed by Grantee that would connect to Highway 1 at designated locations. |
| | The appraiser is aware that in 2016, CalTrans provided a letter to the successor to the Grantor that stated that no frontage road was planned but the right of access to Highway 1 was still in effect and "…at no time, would the grantors or their successors in interest be deprived of access." |
| | Based on the information contained in the 2009 and 2016 letters from CalTrans, as well as a copy of the original grant deed from 1972, it is the opinion of the appraiser that the subject parcel has the right of legal access from Highway 1 across the adjacent 5.692 acre parcel that fronts the freeway. |

| | |
|---|---|
| Visibility: | The subject property has good visibility. |
| Soil Conditions: | We were not given a soil report to review. However, we assume that the soil's load-bearing capacity is sufficient to support residential structures similar to other hillside properties within the immediate subject neighborhood and market area. We did not observe any evidence to the contrary during our physical inspection of the property. Drainage appears to be adequate. |
| Utilities: | All utilities, including water, sewer, electricity, gas and telephone were reported to be adequate to service development on the subject property. As of the date of value, these utilities are available to parcels adjacent to the subject site but not on the subject property itself. |
| Site Improvements: | As the subject site is undeveloped land, there are no site improvements presently in place. |
| Land Use Restrictions: | We were not provide with a preliminary report for review.  Other than the previously discussed grant deed from November 1972 which released and relinquished abutter's rights to Highway 1 but provided legal access to the subject parcel from this roadway, the appraiser is unaware of any other easements or land use restrictions recorded on the subject property that would negatively impact the value or utility of the subject property.

No other use restrictions affecting the subject parcel were uncovered during our research. |
| Flood Zone Description: | The subject property is located in flood zone X (Areas determined to be outside the 500 year flood plain) as indicated by FEMA Map 06081C0126F, dated August 02, 2017.

The flood zone determination and other related data are provided by a third party vendor deemed to be reliable.  If further details are required, additional research is required that is beyond the scope of this analysis. |
| Wetlands: | We were not given a wetlands survey to review.  We did not observe any areas of potential wetlands on the property during our inspection.  However, if subsequent engineering data reveal the presence of regulated wetlands, it could materially affect property value. We recommend a wetlands survey by a professional engineer with expertise in this field. |
| Hazardous Substances: | We observed no evidence of toxic or hazardous substances during our inspection of the site. However, we are not trained to perform technical environmental inspections and recommend the hiring of a professional engineer with expertise in this field. |
| Overall Site Utility: | The subject site is considered to have average to good utility, similar to other hillside development sites in Pacifica to the north and south that have been approved for, or developed with, residential use. |
| Location Rating: | Good |

SITE DESCRIPTION

## PLAT MAP



# Real Property Taxes and Assessments

## Current Property Taxes

The subject property is located in the taxing jurisdiction of San Mateo County, and the assessor's parcel identification is APN: 018-140-620. According to the local tax collector's office, taxes are current as of the date of value.

The assessment and taxes for the property for the current 2017-18 fiscal year are presented in the following table:

| PROPERTY ASSESSMENT INFORMATION | |
|---|---|
| Assessor's Parcel Number: | 018-140-620 |
| Assessing Authority: | San Mateo County |
| Current Tax Year: | 2017-18 |
| Are taxes current? | Taxes are current |
| Is there a grievance underway? | Not to our knowledge |
| **ASSESSMENT INFORMATION** | |
| **Assessed Value** | **Totals** |
| Land: | $3,970,000 |
| Improvements: | $0 |
| Total: | **$3,970,000** |
| **TAX LIABILITY** | |
| Tax Rate Area | 16-017 |
| Ad Valorem Tax Rate | 1.13320% |
| Ad Valorem Taxes | $44,988 |
| Special Assessments | $209 |
| **Total Property Taxes** | **$45,197** |
| Site Area ( SF ) | 2,440,667 |
| Property Taxes per SF Land | $0.02 |

*Compiled by Cushman & Wakefield Western, Inc.*

Total taxes for the property are $45,197, or $0.02 per square foot of land area. The property is not located in an assessment bond district. The property is affected by two special assessments – Pacifica storm drain fee and Pacifica School District Measure D.

Under the provisions of Article XIIIA of the California Tax and Revenue Code (Proposition 13), properties are assessed their market value as of March 1, 1975, the base year lien date, or a later date, such as when a property was last sold or substantial renovation/construction occurred. Under Proposition 13 the base tax rate is limited to 1.0 percent plus any additional increase subject to a two-thirds voter approval (55 percent approval in the case of educational districts). Because of the required voter approval ratio, the tax rate is usually stable.

The assessed value may be increased for inflation a maximum of 2.0 percent per year until the property is again sold, substantial new construction occurs, or the property's use changes significantly.

Reassessment due to new construction is usually based on the additional construction costs. Should the property sell, it would be reassessed according to the Assessor's opinion of market value. Generally, market value for reassessment after transfer of ownership is based on the sale price.

Thus, assessed value typically only relates to market value as of a particular sale date.  As a result, comparison of assessed value with other properties in the market is not material to this analysis. Therefore, tax comparables are not pertinent and not included herein.

# General Plan and Zoning

## General Information

The subject site has General Plan designations of Open Space Residential and Low Density Residential, based on the most recent General Plan dated 1980. The former land use designation allows for residential, agriculture and recreation uses with residential use restricted to a gross/maximum density of up to one unit per five acres (or 0.2 units per acre).  Approximately 3 to 4 acres have the Low Density Residential land use designation which allows for an average of 3.0 to 9.0 dwelling units per acre.  Under both of these land use designations, the allowable density is determined by slope, geology, soils, access, availability of utilities, availability of adequate sewage and highway capacity, public safety, visibility, and environmental sensitivity according to the General Plan.

The property is zoned R-1/B-10 Single Family Residential Hillside (appr 52-53 acres); R-1/B-3 Single Family Residential/Min Lot Area 10,000 sf (appr 3-4 acres) with an HPD, Hillside Preservation District, overlay by the City of Pacifica.



A summary of the subject's zoning for the R-1/B-10 and R-1/B-3 designations is provided in the following table:

| ZONING | | |
|---|---|---|
| **Municipality Governing Zoning:** | City of Pacifica | |
| **Current Zoning:** | R-1/B-10 Single Family Residential Hillside (appr 52-53 acres); | |
| | R-1/B-3 Single Family Residential/Min Lot Area 10,000 sf (appr 3-4 acres) | |
| **Change In Zone Likely:** | Yes | |
| **Change To:** | PD, Planned Development | |
| **Zoning Change Applied For:** | Not to our knowledge | |
| **Permitted Uses:** | Permitted uses within this district include housing, open space, parks and recreation, conservation, transportation, seismic safety, and any uses consistent with appropriate and applicable elements of the adopted General Plan of the City. | |
| **Development Procedures and Standards:** | Applicants of any development proposal within the HPD shall pursue the procedures and standards set forth in the PD District and shall include the requirement for re-zoning to a PD District. | |

| ZONING REQUIREMENTS | | R-1/B-10 | R-1/B-3 ZONING |
|---|---|---|---|
| Minimum Lot Area: | | 5 acres | 10,000 sf |
| Maximum Building Height: | | 35 feet | 35 feet |
| Maximum Lot Coverage (% of lot area): | | 20.0% | 35.0% |
| Minimum Yard Setbacks | | | |
|   Front (feet): | | 25 | 25 |
|   Rear (feet): | | 25 | 25 |
|   Side (feet): | | 20 | 10 |

*Compiled by Cushman & Wakefield Western, Inc.*

According to the City of Pacifica Municipal code, the purposes of the HPD are as follows:

- To maximize choice in types of environment available in the City and particularly to encourage variety in the development pattern of the hillsides;

- The concentration of dwellings and other structures by clustering and/or high rise should be encouraged to help save larger areas of open space and preserve the natural terrain;

- To use to the fullest current understanding of good civic design, landscape architecture, architecture, and civil engineering to preserve, enhance, and promote the existing and future appearance and resources of hillside areas;

- To provide density and land use incentives to aid in ensuring the best possible development of the City's natural features, open space, and other landmarks;

- To encourage the planning, design, and development of building sites in such a fashion as to provide the maximum in safety and human enjoyment while adapting development to, and taking advantage of, the best use of the natural terrain;

- To preserve and enhance the beauty of the landscape by encouraging the maximum retention of natural topographic features, such as drainage swales, streams, slopes, ridge lines, rock-out-croppings, vistas, natural plant formations, and trees;

- To prohibit, insofar as is feasible and reasonable, the padding or terracing of building sites in the hillside areas;

- To provide safe means of ingress and egress for vehicular and pedestrian traffic to and within hillside areas while at the same time minimizing the scarring effects of hillside street construction;

- Utility wires and television lines shall be installed underground;

- Outstanding natural physical features, such as the highest crest of a hill, natural rock outcroppings, major tree belts, and the like, should be preserved;

- Roads should follow natural topography wherever possible to minimize cutting and grading;

- Imaginative and innovative building techniques should be encouraged to create buildings suited to natural hillside surroundings; and

- Detailed and effective arrangements shall be formulated for the preservation, maintenance, and control of open space and recreational lands resulting from planned unit development.

It is the intent of the zoning designation to discourage the development of ridgelines; however, where a parcel has ridgelines that are the only buildable portion of the property, or where it can be demonstrated that the sensitive development of other portions of such a parcel would significantly frustrate the other purposes of this zoning designation, then some development of such ridgelines may be permitted provided most of the ridgeline remains undisturbed, and any such ridgeline development is of low profile, has minimum visual impact, and utilizes a minimum of grading.

According to the zoning code for sites with HPD zoning, the site coverage is determined by a slope-based formula calculated by $C = 40 - s^2/35$ where $C$ represents site coverage and $s$ represents the average percent of natural slope of the site.  Further, the HPD requires all parking in developments to be provided off-street  For residential units, the minimum spaces required include two (2) covered and two (2) uncovered spaces per single family detached units; two (2) covered and one-half (1/2) uncovered space per single family attached units (including vertical and horizontal condominiums); one (1) covered space and one-half (1/2) uncovered space for each bedroom greater than one in each unit for duplex and larger multi-family dwellings; and a minimum of one guest space provided for every 10 dwelling units or fraction thereof.

The appraiser discussed the current General Plan and zoning designations affecting the subject property and development potential with Mr. Christian Murdoch, Senior Planner with the City of Pacifica.  According to Mr. Murdoch, although the subject property has zoning of both R-1/B-10 and R-1/B-3, the Open Space Residential General Plan and HPD overlay require that prior to any development on the site, a re-zoning to PD, Planned Development, would be required.  Further, the Open Space Residential designation would weigh significantly in the City's consideration of development on the site.  Based on the total 56.03 gross acres and the maximum allowance of 1 residential unit per 5.0 acre minimum lot size, the indicated maximum number residential units that could be allowed on the subject property in as-is condition appears to be 11 total units "by right".  While a small portion of the property has a zoning designation of R-1/B-3 which allows for residential units at 3.0 to 9.0 units per acre, Mr. Murdoch reported that the exact density and amount of acreage allowed for this higher density use is not as clear and would likely extend any timeline for development approvals.  As such, it is the opinion of the appraiser that without any applications currently in process with the City Planning Department and our discussion with Mr. Murdoch, there is greater risk and subjectivity in any residential development on the subject property above 11 total residential lots.  As such, it appears that in as-is condition, a total of 11 residential lots is most likely to be approved on the subject property "by-right" based on current General Plan and zoning designations and development requirements.

## Zoning Compliance

Property value is affected by whether or not an existing or proposed improvement complies with zoning regulations, as discussed below.

### Complying Uses

An existing or proposed use that complies with zoning regulations implies that there is no legal risk and that the existing improvements could be replaced "as-of-right."

### Pre-Existing, Non-Complying Uses

In many areas, existing buildings pre-date the current zoning regulations. When this is the case, it is possible for an existing building that represents a non-complying use to still be considered a legal use of the property. Whether

or not the rights of continued use of the building exist depends on local laws. Local laws will also determine if the existing building may be replicated in the event of loss or damage.

**Non-Complying Uses**

A proposed non-complying use to an existing building might remain legal via variance or special use permit. When appraising a property that has such a non-complying use, it is important to understand the local laws governing this use.

## Other Restrictions

We know of no deed restrictions, private or public, that further limit the subject property's use. The research required to determine whether or not such restrictions exist is beyond the scope of this appraisal assignment. Deed restrictions are a legal matter and only a title examination by an attorney or title company can usually uncover such restrictive covenants. We recommend a title examination to determine if any such restrictions exist.

## Zoning Conclusions

The previous owner of the subject property proposed a total of 14 residential units on the subject parcel. However, no entitlements were ever achieved for this total. The appraiser has had both historic and current discussions with city planners at the City of Pacifica. Residential development of single family units was confirmed to be an allowed use and likely to be approved with relatively minimal issues as the Harmony One development project on a similar sized property was approved on a ridge property to the south of the subject. Entitlements would require a rezoning to PD, Planned Development with site specific requirements to preserve open space, slope and public safety. As discussed earlier in the Market Overview chapter, the recent passage of several bills by the California Legislature and signed by the Governor in October 2017 pertaining to housing development in the state appears to suggest that cities in California will be encouraged, and monitored, by the State to approve residential development on sites identified and/or zoned for housing use(s).

Based on the current General Plan and zoning designations, which appear to allow "by right" a density of one unit per five acres, the minimum number of units that appear to be allowed "by right" is 11 total. While additional units may be allowed, the hillside/slope topography of the subject property require a more detailed analysis, which is beyond the scope of this assignment. In addition, discussions with City Planners for this assignment appear to indicate any potential for residential units above the 11 total by-right is highly subjective and likely to take longer to achieve approvals, if they can.

We analyzed the General Plan and zoning requirements in relation to the subject property. We are not experts in the interpretation of complex zoning ordinances but based on our review of public information, discussions with City Planners and the development regulations, single family residential use on the subject property appears to be a complying use.

Detailed zoning studies are typically performed by a zoning or land use expert, including attorneys, land use planners, or architects. The depth of our study correlates directly with the scope of this assignment, and it considers all pertinent issues that have been discovered through our due diligence.

We note that this appraisal is not intended to be a detailed determination of compliance, as that determination is beyond the scope of this real estate appraisal assignment.

# Valuation

## Highest and Best Use

### Highest and Best Use Definition

*The Dictionary of Real Estate Appraisal*, Sixth Edition (2015), a publication of the Appraisal Institute, defines the highest and best use as:

> The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.

As the subject property consists of vacant land only, we only determine the highest and best use of the subject site as vacant land. The property's highest and best use must meet the four criteria described above.

### Highest and Best Use of Site as Vacant

#### Legally Permissible

The General Plan and zoning designations in effect at the time of the appraisal determine the legal permissibility of a potential use of the subject site. As described in the Zoning section, the subject site is zoned R-1/B-10 Single Family Residential Hillside (appr 52-53 acres); R-1/B-3 Single Family Residential/Min Lot Area 10,000 sf (appr 3-4 acres) with a Hillside Preservation District overlay by the City of Pacifica. Permitted uses within this district include housing, open space, parks and recreation, conservation, transportation, seismic safety, and any uses consistent with appropriate and applicable elements of the adopted General Plan of the City.   The General Plan designation of Open Space Residential restricts residential development to one unit per 5.0 acre maximum and requires a re-zoning to PD, Planned Development prior to any development approvals.  We are not aware of any further legal restrictions that limit the potential uses of the subject. Rezoning of the property is likely to PD, Planned Development, for any development to be allowed on the subject site.

#### Physically Possible

The physical possibility of a use is dictated by the size, shape, topography, availability of utilities, and any other physical aspects of the site. The subject site contains 56.03 gross acres, or 2,440,667 square feet. The site is irregularly shaped with hillside topography that varies from rolling to steep. It has poor actual frontage, average access, and good visibility.  The ownership of the subject parcel retains rights of legal access across an adjacent parcel owned by CalTrans to Highway 1.  The overall utility of the site is considered to be average to good. All public utilities are available to the service the site including public water and sewer, gas, electric and telephone but would need to be extended onto the property for development. Overall, the site is considered adequate to accommodate most permitted development possibilities.

#### Financially Feasible and Maximally Productive

In order to be seriously considered, a use must have the potential to provide a sufficient return to attract investment capital over alternative forms of investment. A positive net income or acceptable rate of return would indicate that a use is financially feasible. Financially feasible uses are those uses that can generate a profit over and above the cost of acquiring the site, and constructing the improvements. Of the uses that are permitted, possible, and financially feasible, the one that will result in the maximum value for the property is considered the highest and best use.

As previously discussed, a variety of low-density uses including residential (single family) are legally permissible and physically possible options for the subject land.  The subject property was previously proposed for single family residential development by the prior owner.  Discussions with City of Pacifica planning directors revealed that the proposed use was likely to be approved given the previous owner's plan to retain the majority of the hillside ridges and locate building pads on the flatter areas of the site.  Further, the previous owner had completed entitlements on another similar hillside residential property in Pacifica, known as Harmony One.  This approximate 53 gross acre site with similar topography and zoning to the subject parcel was approved for 10 total residential units and nearly 26 acres of permanent open space. The property was sold as entitled to a developer that has constructed the interior roadways and infrastructure and has been selling off the individual lots for development with single family detached houses.  While this project appears to provide market evidence that development with residential lots for single family detached houses is financially feasible in the subject's market area, this project has several lots remaining to be sold after being available since 2014. The other allowed uses on the subject site under the current zoning are considered to not provide as significant a financial return to the subject property due to their low density and/or public uses.  The only reasonable and financially feasible use of the subject property is for residential (single family) development.

## Conclusion

We considered the legal issues related to zoning and legal restrictions. We also analyzed the physical characteristics of the site to determine what legal uses would be possible, and considered the financial feasibility of these uses to determine the use that is maximally productive. Considering the subject site's physical characteristics and location, as well as the state of the local market, it is our opinion that the Highest and Best Use of the subject site as vacant is for development with residential use with total number of lots as allowed by zoning.

## Most Likely Buyer

Based on the undeveloped status, current zoning and above concluded highest and best use, the most likely buyer of the subject property would be a local or regional home developer that would re-zone and entitle the site for single family residential development.

## Valuation Process

### Methodology

There are three generally accepted approaches to developing an opinion of value: Cost, Sales Comparison and Income Capitalization. We considered each in this appraisal to develop an opinion of the market value of the subject property. In appraisal practice, an approach to value is included or eliminated based on its applicability to the property type being valued and the quality of information available. The reliability of each approach depends on the availability and comparability of market data as well as the motivation and thinking of purchasers.

The valuation process is concluded by analyzing each approach to value used in the appraisal. When more than one approach is used, each approach is judged based on its applicability, reliability, and the quantity and quality of its data. A final value opinion is chosen that either corresponds to one of the approaches to value, or is a correlation of all the approaches used in the appraisal.

We considered each approach in developing our opinion of the market value of the subject property. We discuss each approach below and conclude with a summary of their applicability to the subject property.

### Cost Approach

The Cost Approach is based on the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements which represent the Highest and Best Use of the land; or when relatively unique or specialized improvements are located on the site for which there are few improved sales or leases of comparable properties.

In the Cost Approach, the appraiser forms an opinion of the cost of all improvements, depreciating them to reflect any value loss from physical, functional and external causes. Land value, entrepreneurial profit and depreciated improvement costs are then added, resulting in an opinion of value for the subject property.

### Sales Comparison Approach

In the Sales Comparison Approach, sales of comparable properties are adjusted for differences to estimate a value for the subject property. A unit of comparison such as price per square foot of building area or effective gross income multiplier is typically used to value the property. When developing an opinion of land value the analysis is based on recent sales of sites of comparable zoning and utility, and the typical units of comparison are price per square foot of land, price per acre, price per unit, or price per square foot of potential building area. In both cases, adjustments are applied to the unit of comparison from an analysis of comparable sales, and the adjusted unit of comparison is then used to derive an opinion of value for the subject property.

### Income Capitalization Approach

In the Income Capitalization Approach the income-producing capacity of a property is estimated by using contract rents on existing leases and by estimating market rent from rental activity at competing properties for the vacant space. Deductions are then made for vacancy and collection loss and operating expenses. The resulting net operating income is divided by an overall capitalization rate to derive an opinion of value for the subject property. The capitalization rate represents the relationship between net operating income and value. This method is referred to as Direct Capitalization.

Related to the Direct Capitalization Method is the Yield Capitalization Method. In this method periodic cash flows (which consist of net operating income less capital costs) and a reversionary value are developed and discounted

to a present value using an internal rate of return that is determined by analyzing current investor yield requirements for similar investments.

## Summary

This appraisal employs only the Sales Comparison Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that this approach would be considered necessary and applicable by market participants. Typical purchasers do not generally rely on the Cost or Income Capitalization Approaches when purchasing a property such as the subject of this report. Therefore, we have not employed the Cost Approach or the Income Capitalization Approach to develop an opinion of market value. The absence of these approaches does not diminish the reliability of the analysis.

# Land Valuation

We used the Sales Comparison Approach to develop an opinion of land value. We examined current offerings and analyzed prices buyers have recently paid for comparable sites. If the comparable was superior to the subject, a downward adjustment was made based on the comparable sale. If inferior, an upward adjustment was made.

The most widely used and market-oriented unit of comparison for residential development sites with characteristics similar to those of the subject is typically price per unit.  However, given the unentitled status of the subject property, the price per square foot of land is considered as a supporting, secondary unit of comparison. All transactions used in this analysis are based on the most appropriate method used in the local market.

The major elements of comparison used to value the subject site include the property rights conveyed, the financial terms incorporated into the transaction, the conditions or motivations surrounding the sale, changes in market conditions since the sale, the location of the real estate, its utility and the physical characteristics of the property.

As discussed in the previous General Plan and Zoning chapter, a total of 11 residential units appears to be allowed "by right" on the subject property based on the one unit per minimum 5.0 gross acres and total 56.03 gross acre site size.  While additional units may be allowed on the subject parcel, the hillside/sloping topography of, and need for public roadways and infrastructure on, the subject parcel are considered to indicate a higher level of subjectivity and risk.  As such, the subject site is valued based on the 11 residential lots/units allowed by right under the current land use designations.

The comparables and our analysis are presented on the following pages. Comparable land sale data sheets are presented in the Addenda of this report.

56.03 ACRES OF VACANT LAND

LAND VALUATION

## SUMMARY OF LAND SALES

| No. | Location | Size (sf) | Size (Acres) | No. Of Units | Density | Proposed Use | Zoning | Site Utility | Grantor | Grantee | Sale Date | Sale Price | $/Unit | $/SF Land |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **PROPERTY INFORMATION** | | | | | | | | **TRANSACTION INFORMATION** | | | | | |
| S | Subject Property | 2,440,667 | 56.03 | 11 | 0.20 | Residential (Single Family) | R-1/B-10 and R-1/B-3 | Average to Good | | | | | | |
| 1 | 4000 Palmetto Avenue Pacifica, CA | 335,412 | 7.70 | 9 | 1.17 | Residential-Condo/PUD | PD | Average | PNPM Property Management, LLC | N/A | 4/18 | $2,988,888 | $332,099 | $8.91 |
| 2 | W side Hwy 1 and Rockaway Beach Pacifica, CA | 3,809,757 | 87.46 | N/A | N/A | Mixed Use | C-3x | Average | Pacifica Lenders, LLC | Preserve of Pacifica LLC | 11/14 | $4,750,000 | N/A | $1.25 |
| 3 | Roberts Road at Fassler Avenue Pacifica, CA | 2,221,560 | 51.00 | 10 | 0.20 | Residential-Single-Family | PD | Average | Urban Land Preservation LLC | Sonora Shores III LLC | 4/14 | $7,300,000 | $730,000 | $3.29 |
| 4 | 60 Christopher Court Daly City, CA | 554,954 | 12.74 | 80 | 6.28 | Residential-Condo/PUD | U | Good | Jefferson Elementary School District | Lennar Homes of California, Inc. | 3/14 | $18,800,000 | $235,000 | $33.88 |
| 5 | 801 Fassler Avenue Pacifica, CA | 487,180 | 11.18 | 29 | 2.59 | Residential-Condo/PUD | PD | Average | Fassler Associates LLC | 1106 Nevada LLC | 7/13 | $1,400,000 | $48,276 | $2.87 |
| 6 | SEC of Roberts Road and Fassler Avenue Pacifica, CA | 2,326,104 | 53.40 | 10 | 0.19 | Residential-Single-Family | PD | Average | Cowan-Newton LLC | Urban Land Preservation LLC | 10/11 | $4,425,000 | $442,500 | $1.90 |
| | **STATISTICS** | | | | | | | | | | | | | |
| Low | | 335,412 | 7.70 | 9 | | | | | | | 10/11 | $1,400,000 | $48,276 | $1.25 |
| High | | 3,809,757 | 87.46 | 80 | | | | | | | 4/18 | $18,800,000 | $730,000 | $33.88 |
| Average | | 1,622,495 | 37.25 | 28 | | | | | | | 6/14 | $6,610,648 | $357,575 | $8.68 |

*Compiled by Cushman & Wakefield Western, Inc.*

## LAND SALES ADJUSTMENT GRID

| No. | Price Per Unit | Price PSF Land & Date | Property Rights Conveyed | Conditions of Sale | Financing | Market[1] Conditions | Per Unit Subtotal | PSF Land Subtotal | Location | Site Size | Density | Public Utilities | Utility / Access | Entitlements | Adj. Value Per Unit | Adj. Value PSF Land | Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Economic Adjustments (Cumulative) | | | | | | Property Characteristic Adjustments (Additive) | | | | | | | | |
| 1 | $332,099 4/18 | $8.91 4/18 | Fee Simple 0.0% | Listing -10.0% | None 0.0% | Similar 0.0% | $298,889 -10.0% | $8.02 -10.0% | Similar 0.0% | Smaller -20.0% | Higher 10.0% | Similar 0.0% | Superior -10.0% | Similar 0.0% | $239,111 -20.0% | $6.42 -20.0% | Superior |
| 2 | N/A 11/14 | $1.25 11/14 | Fee Simple 0.0% | Arm's-Length 0.0% | None 0.0% | Inferior 16.2% | N/A 16.2% | $1.45 16.2% | Similar 0.0% | Larger 10.0% | Similar 0.0% | Similar 0.0% | Superior -5.0% | Similar 0.0% | N/A 5.0% | $1.52 5.0% | Inferior |
| 3 | $730,000 4/14 | $3.29 4/14 | Fee Simple 0.0% | Arm's-Length 0.0% | None 0.0% | Inferior 19.6% | $873,200 19.6% | $3.93 19.6% | Similar 0.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | Superior -5.0% | Superior -30.0% | $567,580 -35.0% | $2.55 -35.0% | Superior |
| 4 | $235,000 3/14 | $33.88 3/14 | Fee Simple 0.0% | Arm's-Length 0.0% | None 0.0% | Inferior 20.1% | $282,266 20.1% | $40.69 20.1% | Inferior 15.0% | Smaller -10.0% | Larger 25.0% | Similar 0.0% | Superior -5.0% | Superior -20.0% | $296,379 5.0% | $42.72 5.0% | Inferior |
| 5 | $48,276 7/13 | $2.87 7/13 | Fee Simple 0.0% | Arm's-Length 0.0% | None 0.0% | Inferior 24.1% | $59,900 24.1% | $3.57 24.1% | Similar 0.0% | Smaller -10.0% | Higher 15.0% | Similar 0.0% | Superior -5.0% | Superior -30.0% | $41,930 5.0% | $1.43 -60.0% | Superior |
| 6 | $442,500 10/11 | $1.90 10/11 | Fee Simple 0.0% | Arm's-Length 0.0% | None 0.0% | Inferior 35.1% | $598,007 35.1% | $2.57 35.1% | Similar 0.0% | Similar 0.0% | Higher 0.0% | Similar 0.0% | Superior -5.0% | Similar 0.0% | $568,107 -5.0% | $2.44 -5.0% | Superior |

**STATISTICS**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $48,276 | $1.25 | - Low | | | | | | | | | | Low - | $41,930 | $1.43 |
| $730,000 | $33.88 | - High | | | | | | | | | | High - | $568,107 | $42.72 |
| $357,575 | $8.68 | - Average | | | | | | | | | | Average - | $342,621 | $9.51 |

*Compiled by Cushman & Wakefield Western, Inc.*

**(1) Market Conditions Adjustment Footnote**
See Variable Growth Rate Assumptions Table
Date of Value (for adjustment calculations): 6/4/18

**(2) Utility Footnote**
Utility includes shape, access, frontage and visibility.

### Variable Growth Rate Assumptions

| | |
|---|---|
| Starting Growth Rate: | 5.0% |
| Inflection Point 1 (IP1): | **12/1/2017** |
| Change After IP1: | 0.0% |

## LAND SALES LOCATION MAP



## Discussion of Adjustments

**Property Rights Conveyed**

The property rights conveyed in a transaction typically have an impact on the sale price of a property. Acquiring the fee simple interest implies that the buyer is acquiring the full bundle of rights. Acquiring a leased fee interest typically means that the property being acquired is encumbered by at least one lease, which is a binding agreement transferring rights of use and occupancy to the tenant. A leasehold interest involves the acquisition of a lease, which conveys the rights to use and occupy the property to the buyer for a finite period of time. At the end of the lease term, there is typically no reversionary value to the leasehold interest. Since we are valuing the fee simple interest as reflected by each of the comparables, an adjustment for property rights is not required.

**Conditions of Sale**

Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. In many situations the conditions of sale may significantly affect transaction prices. All closed sales used in this analysis are considered to be "arms-length" market transactions between both knowledgeable buyers and sellers on the open market. Therefore, no adjustments were made based on Comparables 2, 3, 4, 5 and 6.  Comparable 1 is a current listing for a residential development site.  This property has previously been listed on the market for $4,000,000 and $4,300,000 and was most recently significantly decreased to $2,988,888 in April with no change in entitlements or site characteristics.  As such, a downward adjustment was made for this sale of 10 percent, which has been the average of the difference between reasonable asking and listing prices for residential land sites (unentitled) in Pacifica as researched by the appraiser.  However, consideration is given to the fact that this comparable has received no offers or letters of intent based on this revised pricing by potential buyer(s).

**Financial Terms**

The financial terms of a transaction can have an impact on the sale price of a property. A buyer who purchases an asset with favorable financing might pay a higher price, as the reduced cost of debt creates a favorable debt coverage ratio. A transaction involving above-market debt will typically involve a lower purchase price tied to the lower equity returns after debt service. We analyzed all of the transactions to account for atypical financing terms. To the best of our knowledge, all of the sales used in this analysis were accomplished with cash or market-oriented financing. Therefore, no adjustments were required.

**Market Conditions**

The sales that are included in this analysis occurred between October 2011 and April 2018. As the market improved through the end of 2017, we applied an annual adjustment of 5.00 percent.  While residential home prices have increased year over year in Pacifica by double digits, consideration is given to the fact that there are several larger sites listed and/or withdrawn from listings in the Pacifica area.  Comparable 3 was purchased for mixed-use development and nothing has commenced on this site.  Comparables 4 and 7 are the sale of the same property with the former occurring after entitlements received by the buyer of Comparable 7.  Although of similar site size and zoning regulations to the subject, this project has had difficulty in selling the finished lots to individual buyers for residential development.  While increases in home values generally tend to result in greater increases to the underlying land, the same appreciation in land values for unentitled sites in Pacifica was not reported by interviewed market participants due to the higher risk of entitlements and increased development costs as of the date of value. As such, no appreciation was applied for market conditions after December 2017.

**Location**

An adjustment for location is required when the locational characteristics of a comparable property differ from those of the subject property. Nearly all of the comparables are located in Pacifica and were concluded to warrant no

adjustments for location.  Comparable 4 is located in Daly City, which has a median sale price of approximately 15 percent lower than the subject's location in Pacifica as reported by CoreLogic.  Therefore, an upward adjustment of 15 percent was made for the superior location of the subject versus that of Comparable 5.

### Size

The adjustment for size generally reflects the inverse relationship between unit price and lot size. Smaller sites tend to sell for higher unit prices than larger development sites, and vice versa. After analysis of the comparable sales, upward adjustments were made based on larger land parcels, and downward adjustments were made based on smaller land parcels.  These adjustments were also tempered by the adjustment for density, as discussed in the following section.

### Density

On a price per unit basis, density has an inverse relationship with higher density project sites tending to sell for lower per unit prices.  On a per square foot basis, there is a direct relationship between density and price per square foot.  Adjustments were concluded based on Comparables 1, 4 and 5 with upward adjustments for the subject based on price per unit but downward adjustments on a per square foot basis.  The table shows the adjustment on the per unit basis with the total adjusted value on a per square foot basis calculated by the inverse of this adjustment.

### Public Utilities

The availability of public utilities has a significant impact on the value of a property. Municipal utility providers often, but not always, provide utilities such as gas, water, electric, sewer, and telephone. It is therefore important to understand any differences that may exist in the availability of public utilities to the subject property and its comparables. All of the sales, like the subject, had full access to public utilities at the time of sale to support development. Therefore, no adjustments were required based on any of the comparables.

### Utility / Access

The subject parcel has hillside topography that ranges from gentle rolling to steep.  There are level areas on the parcel for future potential development pad sites.  Many of the comparable sites also had similar hillside topography. Comparable 1 has level topography and as such, warrants a downward adjustment for the subject.

This category also includes access. While the subject property has the rights of access from Highway 1, it is over an adjacent parcel owned by CalTrans while all of the comparable sites have direct access and/or frontage from public right of ways as of the date of sale. Therefore, downward adjustments were made based on all of the comparables for this superior factor versus that of the subject.

### Entitlements

The subject property has no entitlements in place as of the date of value.  Comparables 3, 4 and 5 all represent the purchases of sites with entitlements in place for development.  Comparables 3 and 6 are the sale and re-sale of the same property.  The former was as an entitled site and the latter was unentitled.  Accounting for the passage of time between the two sales, the premium for entitlements in Pacifica appears to be 30 percent, which is in line with reported premiums reported by interviewed market sources.  The adjustment for entitlements for Comparable 4 is lower as it is situated in Daly City where the risk and timeline to achieve entitlements is lower than Pacifica. Consideration is also given to the recent passage of numerous state laws in Fall 2017 that are intended to make the entitlement process less onerous for units that are allowed "by right" under land use/zoning designations.

## Discussion of Comparable Sales

### Comparable Sale No. 1

This comparable property is located at 4000 Palmetto Avenue, within the PD zoning district. The parcel contains 335,412 square feet, or 7.70 acres. A total of 9 units were originally planned on the site, however the zoning allows for a maximum of 6 units without a conditional use permit. PNPM Property Management, LLC listed this property in early April 2018 for a total price of $2,988,888, or $332,099 per unit based on 9 total units.  This asking price equates to $8.91 per square foot of site area. This property has average utility, and all available public utilities. Its intended use is a residential use.  This parcel is located south of Mussel Rock and has frontage on Palmetto Avenue. This site is located on a mostly west-facing slope that is bisected by a creek. The property was originally listed for sale at $4,000,000 in 2014 but withdrawn from the market after receiving no serious offers.  It was put back on the market in early November 2017 at $4,300,000 and reportedly received interest, but no offers at this price.  The asking price was reduced in April 2018 to $2,988,888.  The property had preliminary plans by the seller for 9 single family residential units but discussions with the City reportedly revealed that a maximum of 6 houses would be more likely on the site. Any development requires Coastal Commission review.  The asking price was reported to be based on a total of 9 single family lots being allowed although no entitlements are in place.

After all adjustments, this sale indicated a land value for the subject property of $239,111 per unit and $6.42 per square foot of land area.

### Comparable Sale No. 2

Comparable No. 2 is located on the W side Hwy 1 and Rockaway Beach, with a C-3x zoning. It contains 3,809,757 square feet, or 87.46 acres.  This property was sold from Pacifica Lenders, LLC to Preserve of Pacifica LLC in November 2014 for a price of $4,750,000, or $1.25 per square foot of land area.  Public utilities on this site were all available and its utility is average. At the time of sale, this site was intended for mixed use including single family and multi-family residential, hotel, commercial space including retail and office, and public recreational spaces.  The site is the former Rockaway Quarry on west side of Highway 1 with expansive ocean views.  Any development on the site is subject to Coastal Commission approvals.  No entitlements were in place for any development at the time of sale.

After all adjustments, this sale indicated a land value for the subject site of $1.52 per square foot.

### Comparable Sale No. 3

Located on Roberts Road at Fassler Avenue within the PD zoning district, this property was sold from Urban Land Preservation LLC to Sonora Shores III LLC in April 2014 for $7,300,000, equal to $730,000 per unit and $3.29 per square foot of land area.  At the time of sale, this site was intended for residential-single-family. It contains 2,221,560 square feet, or 51.00 acres. The site has average utility, and public utilities were all available. This is a hillside development area that had all entitlements in place for 10 single family lots.  Most lots offer expansive ocean views. Subsequent to the sale, after installation of roadways and infrastructure, the developer originally listed the finished lots at asking prices ranging from low $4,000,000s to $5,000,000s.  These prices have been decreased to $1,750,000 to $2,000,000s.

After all adjustments, this sale indicated a land value for the subject property of $576,580 per lot and $2.55 per square foot of land area.

### Comparable Sale No. 4

This comparable property is located at 60 Christopher Court in the U zoning district in Daly City.  It encompasses 554,954 square feet, or 12.74 gross acres.  At the time of sale, the intended use of this site was residential condo/PUD.  Jefferson Elementary School District sold the property to Lennar Homes of California, Inc. in March

2014 for a price of $18,800,000, or $235,000 per unit and $33.88 per square foot of site area.   This site had good utility, and public utilities were all available. The site is located at the top of a hill in Daly City just off Highway 1 and Skyline Boulevard.  At the time of sale it was improved with a vacant public elementary school that was to be demolished to make way for construction of an 80-home residential subdivision.  The project is known as Crestview Estates and was planned to offer detached homes ranging in size from 1,999 to 2,426 square feet.  Due to the site's orientation, some homes would offer Bay views.

After all adjustments, this sale indicated a land value of $296,379 per unit and $42.72 per square foot of site area for the subject property.

**Comparable Sale No. 5**

This comparable property is located at 801 Fassler Avenue in Pacifica with a PD zoning. Its size is 487,180 square feet, or 11.18 acres. 1106 Nevada LLC acquired this property from Fassler Associates LLC in July 2013 for $1,400,000, or $48,276 per unit and $2.87 per square foot of site area.  The utility of this site was average with all available public utilities. The intended use of this site at the time of sale was residential condo/PUD.  At the time of sale, the site was approved for 29 condominium units to be located on 1.22 acres with the remainder to be left as open space area. The sale price included all entitlements in place at time of sale. The price per square foot of the 1.22-acre residential area was approximately $26 per square foot.

After all adjustments, this sale indicated a land value for the subject property of $41,930 per unit and $1.43 per square foot.

**Comparable Sale No. 6**

Comparable No. 6 was the original purchase of Comparable 3 from Cowan-Newton LLC to Urban Land Preservation LLC, which occurred in October 2011 for a price of $4,425,000, or $442,500 per unit and $1.90 per square foot. Located at SEC of Roberts Road and Fassler Avenue, and in the PD zoning district, this parcel contains 2,326,104 square feet, or 53.40 acres.  The site had average utility and public utilities were all available. At the time of this sale, this site was intended for residential single-family use but had no entitlements in place.  This is a hillside development site that features views of the Pacific Ocean. A full EIR was completed on the property in 2007.

After all adjustments this sale indicated a land value for the subject site of $568,107 per unit and $2.44 per square foot of the subject site.

## Conclusion of Site Value

The adjustments applied to the comparable sales in the Land Sales Adjustment Chart reflect what we determined is appropriate in the marketplace.  Despite the subjectivity, the adjustments were considered reasonable and were applied consistently.

After a thorough analysis, the comparable land sales reflect adjusted unit values for the subject property ranging from $41,930 per unit to $568,107 per unit, with an average of $342,621 per unit.  On a per square foot basis, the adjusted values indicated for the subject site are $1.43 to $42.72, with an average of $9.51 per square foot.  The high end of the per square foot range was represented by Comparable 4, which a significantly higher density allowed.  Minimal weight is given to the adjusted values indicated by this comparable.

While Sales 3 and 6 are the most recently closed purchases of single family development sites of similar site, topography and total potential units to the subject site, consideration is given to the fact that nearly four years after the closing of Sale 3, the project still has lots available for sale.  The current asking prices are significantly lower than the original listing prices.  Consideration is also given to the factors that Comparable 1 is a current listing that has reduced its asking price significantly in the past six months while Comparable 2 was the most recent large

development site purchased in Pacifica nearly across Highway 1 from the subject.  While planned for mixed use, no approvals are in place nor has construction commenced.

Therefore, based on our analysis of the comparables, as well as the physical and locational characteristics of the subject property, we concluded that the indicated as-is land value by the Sales Comparison Approach was:

| LAND VALUE CONCLUSION | Price Per Unit |
|---|---|
| Unit Value | $450,000 |
| Total Number of Potential Units | x  11 |
| Indicated Value, Rounded | $4,950,000 |
| | |
| **AS-IS LAND VALUE CONCLUSION** | **$4,950,000** |
| $/Unit Basis - Weighted Avg | $450,000 |
| $/SF Basis - Weighted Avg | $2.03 |

*Compiled by Cushman & Wakefield Western, Inc.*

The subject property was most recently purchased in August 2016 for $4,780,270.  The above concluded as-is market value for the subject property represents a 3.6 percent increase over the most recent purchase.  It is considered supported based on the comparable sales and market conditions for large land sites in Pacifica.

# Final Value Opinion

## Valuation Methodology Review and Reconciliation

This appraisal employs only the Sales Comparison Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that this approach would be considered necessary and applicable by market participants. Typical purchasers do not generally rely on the Cost or Income Capitalization Approaches when purchasing a property such as the subject of this report. Therefore, we have not employed the Cost Approach or the Income Capitalization Approach to develop an opinion of market value. The absence of these approaches does not diminish the reliability of the analysis.

The approach indicated the following:

| FINAL VALUE CONCLUSION | |
| --- | --- |
| | Market Value As-Is |
| Date of Value | June 4, 2018 |
| Land Valuation | |
| Land Value | $4,950,000 |
| Land Value Per Unit | $450,000 |
| Land Value Per Square Foot | $2.03 |
| Final Value Conclusion | $4,950,000 |

*Compiled by Cushman & Wakefield Western, Inc.*

We gave sole weight to the Sales Comparison Approach because this mirrors the methodology used by purchasers of this property type.

| Value Conclusion | | | |
| --- | --- | --- | --- |
| Appraisal Premise | Real Property Interest | Date Of Value | Value Conclusion |
| Fair Market Value As-Is | Fee Simple | June 04, 2018 | $4,950,000 |

*Compiled by Cushman & Wakefield Western, Inc.*

# Assumptions and Limiting Conditions

"Report" means the appraisal or consulting report and conclusions stated therein, to which these Assumptions and Limiting Conditions are annexed.

"Property" means the subject of the Report.

"Cushman & Wakefield" means Cushman & Wakefield, Inc. or its subsidiary that issued the Report.

"Appraiser(s)" means the employee(s) of Cushman & Wakefield who prepared and signed the Report.

The Report has been made subject to the following assumptions and limiting conditions:

- No opinion is intended to be expressed and no responsibility is assumed for the legal description or for any matters that are legal in nature or require legal expertise or specialized knowledge beyond that of a real estate appraiser. Title to the Property is assumed to be good and marketable and the Property is assumed to be free and clear of all liens unless otherwise stated. No survey of the Property was undertaken.

- The information contained in the Report or upon which the Report is based has been gathered from sources the Appraiser assumes to be reliable and accurate. The owner of the Property may have provided some of such information. Neither the Appraiser nor Cushman & Wakefield shall be responsible for the accuracy or completeness of such information, including the correctness of estimates, opinions, dimensions, sketches, exhibits and factual matters. Any authorized user of the Report is obligated to bring to the attention of Cushman & Wakefield any inaccuracies or errors that it believes are contained in the Report.

- The opinions are only as of the date stated in the Report. Changes since that date in external and market factors or in the Property itself can significantly affect the conclusions in the Report.

- The Report is to be used in whole and not in part. No part of the Report shall be used in conjunction with any other analyses. Publication of the Report or any portion thereof without the prior written consent of Cushman & Wakefield is prohibited. Reference to the Appraisal Institute or to the MAI designation is prohibited. Except as may be otherwise stated in the letter of engagement, the Report may not be used by any person(s) other than the party(ies) to whom it is addressed or for purposes other than that for which it was prepared. No part of the Report shall be conveyed to the public through advertising, or used in any sales, promotion, offering or SEC material without Cushman & Wakefield's prior written consent. Any authorized user(s) of this Report who provides a copy to, or permits reliance thereon by, any person or entity not authorized by Cushman & Wakefield in writing to use or rely thereon, hereby agrees to indemnify and hold Cushman & Wakefield, its affiliates and their respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorneys' fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon, the Report by any such unauthorized person(s) or entity(ies).

- Except as may be otherwise stated in the letter of engagement, the Appraiser shall not be required to give testimony in any court or administrative proceeding relating to the Property or the Appraisal.

- The Report assumes (a) responsible ownership and competent management of the Property; (b) there are no hidden or unapparent conditions of the Property, subsoil or structures that render the Property more or less valuable (no responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them); (c) full compliance with all applicable federal, state and local zoning and environmental regulations and laws, unless noncompliance is stated, defined and considered in the Report; and (d) all required licenses, certificates of occupancy and other governmental consents have been or can be obtained and renewed for any use on which the value opinion contained in the Report is based.

- The physical condition of the improvements considered by the Report is based on visual inspection by the Appraiser or other person identified in the Report. Cushman & Wakefield assumes no responsibility for the soundness of structural components or for the condition of mechanical equipment, plumbing or electrical components.

- The forecasted potential gross income referred to in the Report may be based on lease summaries provided by the owner or third parties. The Report assumes no responsibility for the authenticity or completeness of lease information provided by others. Cushman & Wakefield recommends that legal advice be obtained regarding the interpretation of lease provisions and the contractual rights of parties.

- The forecasts of income and expenses are not predictions of the future. Rather, they are the Appraiser's best opinions of current market thinking on future income and expenses. The Appraiser and Cushman & Wakefield make no warranty or representation that these forecasts will materialize. The real estate market is constantly fluctuating and changing. It is not the Appraiser's task to predict or in any way warrant the conditions of a future real estate market; the Appraiser can only reflect what the investment community, as of the date of the Report, envisages for the future in terms of rental rates, expenses, and supply and demand.

- Unless otherwise stated in the Report, the existence of potentially hazardous or toxic materials that may have been used in the construction or maintenance of the improvements or may be located at or about the Property was not considered in arriving at the opinion of value. These materials (such as formaldehyde foam insulation, asbestos insulation and other potentially hazardous materials) may adversely affect the value of the Property. The Appraisers are not qualified to detect such substances. Cushman & Wakefield recommends that an environmental expert be employed to determine the impact of these matters on the opinion of value.

- Unless otherwise stated in the Report, compliance with the requirements of the Americans with Disabilities Act of 1990 (ADA) has not been considered in arriving at the opinion of value. Failure to comply with the requirements of the ADA may adversely affect the value of the Property. Cushman & Wakefield recommends that an expert in this field be employed to determine the compliance of the Property with the requirements of the ADA and the impact of these matters on the opinion of value.

- If the Report is submitted to a lender or investor with the prior approval of Cushman & Wakefield, such party should consider this Report as only one factor, together with its independent investment considerations and underwriting criteria, in its overall investment decision. Such lender or investor is specifically cautioned to understand all Extraordinary Assumptions and Hypothetical Conditions and the Assumptions and Limiting Conditions incorporated in this Report.

- In the event of a claim against Cushman & Wakefield or its affiliates or their respective officers or employees or the Appraisers in connection with or in any way relating to this Report or this engagement, the maximum damages recoverable shall be the amount of the monies actually collected by Cushman & Wakefield or its affiliates for this Report and under no circumstances shall any claim for consequential damages be made.

- If the Report is referred to or included in any offering material or prospectus, the Report shall be deemed referred to or included for informational purposes only and Cushman & Wakefield, its employees and the Appraiser have no liability to such recipients. Cushman & Wakefield disclaims any and all liability to any party other than the party that retained Cushman & Wakefield to prepare the Report.

- Unless otherwise noted, we were not given a soil report to review. However, we assume that the soil's load-bearing capacity is sufficient to support existing and/or proposed structure(s). We did not observe any evidence to the contrary during our physical inspection of the property. Drainage appears to be adequate.

- Unless otherwise noted, we were not given a title report to review. We do not know of any easements, encroachments, or restrictions that would adversely affect the site's use. However, we recommend a title search to determine whether any adverse conditions exist.

- Unless otherwise noted, we were not given a wetlands survey to review. If subsequent engineering data reveal the presence of regulated wetlands, it could materially affect property value. We recommend a wetlands survey by a professional engineer with expertise in this field.

- Unless otherwise noted, we observed no evidence of toxic or hazardous substances during our inspection of the site. However, we are not trained to perform technical environmental inspections and recommend the hiring of a professional engineer with expertise in this field.

- Unless otherwise noted, we did not inspect the roof nor did we make a detailed inspection of the mechanical systems. The appraisers are not qualified to render an opinion regarding the adequacy or condition of these components. The client is urged to retain an expert in this field if detailed information is needed.

- By use of this Report each party that uses this Report agrees to be bound by all of the Assumptions and Limiting Conditions, Hypothetical Conditions and Extraordinary Assumptions stated herein.

# Addenda Contents

Addendum A:    Legal Description
Addendum B:    CalTrans Letter 3-4-2009
Addendum C:    Comparable Land Sale Data Sheets
Addendum D:    Qualifications of the Appraiser

## Addendum A:    Legal Description

ORDER NO. : 0227018960

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of San Mateo, State of California, and is described as follows:

TRACT I:

Beginning at the most Southerly corner of the certain 398.284 acre tract shown on the Map entitled, "Survey of 398.284 acre tract, lands now or formerly of Hibernia Savings and Loan Society, Willie G. Frost, Registered Civil Engineer No. 362", which Map was filed in Book 1 of Licensed Land Surveyor's Maps, at Page 78, said Map being hereinafter referred to as "Frost Survey", said point of beginning is marked by a concrete monument with 1/2 inch iron pipe marked "5", which monument also marks the Northeast corner of the Parcel described in Decree and Judgment Quieting Title, issued out of the Superior Court, of the State of California in and for the County of San Mateo on January 14, 1938, Case No. 25972 entitled, "Frank Manson, Plaintiff vs. Hibernia Savings and Loan Society etal. Defendants", a certified copy of which was recorded in Book 770 of Official Records of San Mateo County at Page 448, said monument also being shown on the Map entitled, "Map of Property of F.H. Manson at Rockaway Beach, Geo. W. Wade, Civil Engineer and Licensed Land Surveyor", which was filed in Book 1 of Licensed Land Surveyor's Maps, Pages 43, 44, 45 and 46; the description in said Decree and last named Map, being hereinafter referred to as "Wade Survey"; thence from said point of beginning, along the Southerly boundary of said 398.284 acre tract, North 65° 08' West 499.49 feet to another concrete monument with 1/2 inch pipe marked "6" (said course and distance being shown as North 66° 03' 16" West 500 feet by said Wade Survey); thence continuing along said boundary, North 65° 08' West 2,446.26 feet to a concrete monument on the Easterly line of the State Highway between Edgemar and Rockaway Beach, as established by Quit Claim Deed from the Hibernia Savings and Loan Society to State of California, dated September 6, 1940, recorded March 6, 1941, Book 942 of said Official Records at Page 334, (hereinafter referred to as "State Survey"); thence along said Easterly line of State Highway, North 51° 28' East (North 51° 11' 30" East by State Survey) 416.11 feet, North 82° 05' 50" East (North 82° 09' 20" East by State Survey) 116.61 feet, North 41° 15' 45" East (North 40° 59' 15" East by State Sun/ey) 254.02 feet and North 51° 28' East (North 51° 11' 30" East by State Survey) 1,163.72 feet; thence leaving said Highway, South 39° 56' 30" East 276.22 feet; thence South 40° 25' East 1,284.74 feet, more or less, to the Southwest corner of that certain 4.753 acre tract, conveyed by Title Insurance & Guaranty Co. to Joe Cacciapeglia, dated December 27, 1943, recorded December 30, 1943, Book 1093 at Page 439; Official Records; thence along the Southerly boundary of said 4.753 acre tract and the prolongation thereof, South 85° 45' East 185.0 feet to the Easterly boundary of said 398.284 acre tract; thence along said last named boundary, South 1° 57' 45" West 1,227.65 feet, more or less, to the point of beginning.

Excepting therefrom the lands described in the following Deeds:

A. From California Pacific Title Insurance Company, a corporation, to Finson & Gartin Investment Co., a co-partnership, composed of Chris Finson and James U. Gartin, Jr., dated February 17, 1956, recorded March 6, 1956 in Book 2981, Page 140, Series 34369-N, Official Records.

B.  From California Pacific Title Insurance Company, a corporation, to California and Nevada District of the Lutheran Church-Missouri Synod, a California corporation, recorded October 9, 1956 in Book 3109, at Page 153, Series No. 94662-N, Official Records.

C.  From Title Insurance and Trust Company, a corporation, successor by merger to California Pacific Title Insurance Company, a corporation to Maryin Compton and, Ramona J. Compton, his wife, in joint tenancy, dated May 12, 1959, recorded May 12, 1959 in Book 3598, at Page 658, Series No. 48034-R, Official Records.

D.  From Title Insurance and Trust Company, a corporation, successor by merger to California Pacific Title Insurance Company, a corporation, to the Protestant Episcopal Bishop of California, a corporation sole, dated May 12 1956, recorded May 12, 1956 in Book 3598, at Page 667, Series No. 48039-R, Official Records.

E.  From Raymond T. Whitney and Henrietta W. Whitney, his wife, & H.C. Larson and Mable A. Larson, his wife and Robert A. Taryer and Mary Ann Tarver, his wife to Lorne W. Dawdy and Doris W. Dawdy, his wife dated November 13, 1961, recorded November 13, 1961 in Book 4091, at Page 652, Series No. 14186-U, Official Records.

F.  From Robert A. Tarver, a widower and Robert A. Taryer, Executor of the Estate of Mary Ann Tarver, deceased and Henry C. Larson aka H.C. Larson and Mabel A. Larson, his wife, to the State of California dated July 11, 1972, recorded November 2, 1972 in Book 6263 at Page 352, Series No. 73518AF, Official Records.

And excepting therefrom the following described Parcel:

G.  Beginning at the Southeast corner at Lot 10 shown on the Map "Jama Highlands Unit No. 2", filed February 18, 1963 in Volume 57 of Maps, Page 4, San Mateo County Records; thence along the extension of the West line of Reichling Avenue as shown on said Map, South 0° 22' East 34.25 feet; thence parallel to the Southern boundary of said Lot 10, North 87° 55' West 100.00 feet; thence parallel to said West line of Reichling Avenue North 0° 22' West 34.25 feet to a point on the Southern boundary of said Lot 10; thence South 87° 55' East 100.00 feet to the point of beginning.

APN: 018-140-620          JPN No. 018-014-140-42A

Addendum B:    CalTrans Letter 3-4-2009

STATE OF CALIFORNIA—BUSINESS, TRANSPORTATION AND HOUSING AGENCY                    ARNOLD SCHWARZENEGGER, Governor

**DEPARTMENT OF TRANSPORTATION**
111 GRAND AVENUE
P. O. BOX 23440
OAKLAND, CA  94623-0440
PHONE (510) 286-5400
FAX  (510) 286-5482
TTY 711

RECEIVED MAR 0 6 2009



*Flex your power!*
*Be energy efficient!*

March 4, 2009

Mr. David Thomas
Thomas-Pacifica LLC
3100 Oak Road, Suite 140
Walnut Creek, CA  94597

Dear Mr. Thomas:

The following information is provided in response to your request for clarification of the status of the right of access to and from your property in Pacifica to State Route 1. We have had several meetings with you, your brother, your consultants and staff from local public agencies to discuss this matter and pending highway projects which may impact your property.

The State of California, Department of Transportation acquired Parcel No. 28797 by grant deed recorded on November 2, 1972 from Robert A. Tarver, et al. The parcel was acquired for a proposed project to replace the then existing conventional highway improvements on State Route 1 in Pacifica with a freeway and related frontage roads.

The Department acquired a 5.692 acre portion of the grantors' property in fee together with the grantors' access rights to the then existing highway. The project design and the intent of the parties was that, after construction of the freeway and frontage road facilities, the grantors' remaining property would have access to a frontage road which would be connected to the freeway at locations selected by the Department as part of the overall design of the project.

To this end, the grant deed contained the following clause:

"This conveyance is made for the purposes of a freeway and adjacent frontage road and the grantor hereby releases and relinquishes to the grantee any and all abutter's rights, including access rights, appurtenant to grantor's remaining property in and to said freeway, provided, however, that such remaining property shall abut upon and have access to said frontage road which will be connected to the freeway only at such points as may be established by public authority."

It was the intent and understanding of the parties that after acquisition, until the time of freeway construction, the grantors would continue to enjoy the same access to State Route 1 as they did prior to acquisition. In other words, at no time would the grantors be deprived of access. They would either continue to have direct access to State Route 1 or they would have direct access to the frontage road which would connect to State Route 1 at designated locations.

It was subsequently determined that the project for which the property and the access rights were acquired will not be constructed. The Department is cooperating with local public agencies in the design of another project on State Route 1 which may require a portion of the right of way acquired for the State's original project. Until design is sufficiently advanced to determine the

Mr. David Thomas
March 4, 2009
Page 2

full extent of the required right of way, it is premature to declare any of the property and property rights acquired from Tarver, et al as surplus.

In the meantime, property owners who are successors in interest to Tarver, et al, retain and enjoy all the rights which Tarver, et al had. These include the right of access to existing State Route 1 to the same extent that right of access existed prior to the transaction referenced above. These rights include the right to construct, at owners' expense, a driveway or road across Parcel No. 28797, connecting to State Route 1 right of way to serve as access to the remainder of the grantors' property to accommodate a development as may be permitted by the City or other legal due process. The design features of such access are subject to the review and approval of the Department which approval will not be unreasonably withheld or delayed. In that regard, you have provided us with an "Entry Road Plan" prepared by Aliquot Associates, Inc., Planning Civil Engineers and Surveyors described as Job No. 208009.0 which generally describes your engineer's concept as to proposed access to State Route 1. While we cannot approve any design without going through the formal process of an encroachment permit application, provided the ultimate proposed entry roadway plan is substantially similar to that proposed by your engineers; we do believe that we would be favorably disposed conceptually to that design concept.

At such time as you are prepared to construct a driveway or a road across Parcel No. 28797, you will need to furnish the Department with engineered plans together with an encroachment permit application for review and approval. Given that a right of access from the parcel to State Route 1 or a frontage road exists as described and confirmed hereinabove, the Department's role is to ensure that the intersection of the driveway or road with State Route 1 is designed to the State's standards and conforms to State's operational requirements.

Any highway improvement project, by the State and/or another project sponsor, will need to accommodate or acquire the access rights to your property. Any necessary physical modifications to an existing access road as a result of a subsequent highway improvement project will normally be a cost to the highway project, and not be at your expense.

Please contact me if you have any questions or require additional information.

Sincerely,

R. A. MACPHERSON
Deputy District Director
Right of Way

cc: Joe Hurley, Director, San Mateo County Transportation Authority
Van O'Campo, City of Pacifica
Skip Sowko, District Division Chief, Design South
Michael Condie, Chief, Encroachment Permits
Terry Bowen, Gray • Bowen and Company, Inc.
Darnall W. Reynolds, Gray • Bowen and Company, Inc.

73519AF  v.6283 PAGE352

RECORDED AT REQUEST OF

RECORDING REQUESTED BY
State of California

WHEN RECORDED RETURN TO
Division of Highways
Box 7791 - Rincon Annex
San Francisco, Calif. 94119
RMC No. 423135
A.P. 2018-140-010

TITLE INSURANCE AND TRUST CO.

NOV 2  10 52 AM 1972

MARVIN CHURCH, RECORDER
SAN MATEO COUNTY
OFFICIAL RECORDS

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## GRANT DEED
### (INDIVIDUAL)

| DISTRICT | COUNTY | ROUTE | P.M. | NUMBER |
|---|---|---|---|---|
| 04 | SM | 1 | 42.3 | 28797 |

ROBERT A. TARVER, a widower; and ROBERT A. TARVER, Executor

of the Estate of MARY ANN TARVER, deceased; and

HENRY C. LARSON also known as H. C. LARSON and MABEL A. LARSON, his wife

GRANT to the STATE OF CALIFORNIA, all that real property in the ___City of Pacifica___ County

of ___San Mateo___, State of California, described as:

COMMENCING at the intersection of the southeasterly line
of existing State highway between Rockaway Beach and
Edgemar with the northeasterly line of that parcel of land to
The Protestant Episcopal Bishop of California, a corporation,
recorded May 12, 1959, in Book 3598, at Page 667, Official
Records of San Mateo County; thence along said southeasterly
line N. 42°12'02" E., 219.51 feet and N. 52°24'17" E.,
563.52 feet to the southwesterly line of that parcel of land
to Lorne W. Dawdy, et ux, recorded November 13, 1961, in
Book 4091, at Page 652, Official Records of San Mateo County;
thence along last said line S. 37°35'43" E., 199.99 feet to the
southeasterly line of said Dawdy parcel; thence along last said
line N. 52°24'17" E., 89.96 feet to the southwesterly line of
that parcel of land to Marvin Compton, et ux, recorded
May 12, 1959, in Book 3598, at Page 658, Official Records of
San Mateo County; thence along last said line S. 37°35'43" E.,
120.00 feet; thence S. 53°46'44" W., 879.77 feet to said north-
easterly line; thence along last said line N. 37°35'43" W.,
260.00 feet to the point of commencement.

CONTAINING 5.692 acres, more or less.

Governmental entity acquiring title.
Tax exempt effective November 10, 1969

SEP 29 1971

FORM R.W/W-0 (REV. 6-68)

VOL.6203 PAGE352

RECORDER'S OFFICE SAN MATEO COUNTY

This deed is executed pursuant to an order given and made
by the Superior Court of the State of California, in and for the
County of  San Mateo            , on the     11th        day
of     July          , 19 72     , in a proceeding therein
pending entitled, "In the Matter of the Estate of  Mary Ann Tarver,
deceased, and numbered     42190             , in the files and
records of said court", a certified copy of which order is
recorded contemporaneously herewith in the office of the County
Recorder of said county, to which reference is hereby made.

RECORDER'S OFFICE SAN MATEO COUNTY

This conveyance is made for the purposes of a freeway and adjacent frontage road and the grantor hereby releases and relinquishes to the grantee any and all abutter's rights, including access rights, appurtenant to grantor's remaining property in and to said freeway, provided, however, that such remaining property shall abut upon and have access to said frontage road which will be connected to the freeway only at such points as may be established by public authority.

The bearings and distances used in the above description are on the California Coordinate System, Zone 3. Multiply the above distances by 1.0000733 to obtain ground level distances.

RECORDER'S OFFICE SAN MATEO COUNTY

The grantor further understands that the present intention of the grantee is to construct and maintain a public highway on the lands hereby conveyed in fee and the grantor, for himself, his successors and assigns, hereby waives any claims for any and all damages to grantor's remaining property contiguous to the property hereby conveyed by reason of the location, construction, landscaping or maintenance of said highway.

(As used above, the term "grantor" shall include the plural as well as the singular number and the words "himself" and "his" shall include the feminine gender as the case may be.)

Dated this 11th day of July 19 72

Signed and delivered in the presence of

_ROBERT A. TARVER_

ROBERT A. TARVER, Executor of the
Estate of Mary Ann Tarver, deceased

_H. C. LARSON_

MABEL A. LARSON

### SUBSCRIBING WITNESS

STATE OF CALIFORNIA

COUNTY OF

On ___, 19 ___ before me, the undersigned, a Notary Public in and for the State of California, residing therein, duly commissioned and sworn, personally appeared ___ known to me to be the person whose name is subscribed to the within instrument as a witness thereto, who, being by me duly sworn, deposed and said: that he resides in the County of ___, State of California; that he was present and saw ___

___ personally known to him to be the person___ described in and whose name___ subscribed to the within instrument, execute the same; and that affiant subscribed his name thereto as a witness to said execution.

WITNESS my hand and official seal.

(Seal) ___

Name (Typed or Printed)
Notary Public in and for said State

### GRANTOR(S)

STATE OF CALIFORNIA

COUNTY OF San Mateo

On July 11, 19 72 before me, the undersigned, a Notary Public in and for the State of California, residing therein, duly commissioned and sworn, personally appeared ROBERT A. TARVER, ROBERT A. TARVER, Executor of the Estate of Mary Ann Tarver, deceased H. C. LARSON and MABEL A. LARSON

known to me to be the person S, whose name S are subscribed to the within instrument and acknowledged that they executed the same.

WITNESS my hand and official seal.

HELEN KOERSELMAN
NOTARY PUBLIC-CALIFORNIA
COUNTY OF SAN MATEO
My Commission Expires Dec. 11, 1972

### (CERTIFICATE OF ACCEPTANCE, GOVERNMENT CODE, SECTION 27281)

THIS IS TO CERTIFY, That the State of California, grantee herein, acting by and through the Department of Public Works, Division of Highways, hereby accepts for public purposes the real property, or interest therein, conveyed by the within deed and consents to the recordation thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of July, 19 72

JAMES A. MOE

Director of Public Works

By _____

Asst. District Right of Way Agent

Attorney in Fact

VOL 6263 PAGE 355



ENTRY ROAD PLAN EXHIBIT
56 ACRES PACIFICA
APN # 018-140-620
SAN MATEO COUNTY   CALIFORNIA

CITY OF PACIFICA

VICINITY MAP
NO SCALE

TYPICAL SECTION A-A
N.T.S.

TYPICAL SECTION B-B
N.T.S.

ENTRY ROAD PLAN
SCALE: 1"=40'

CABRILLO HIGHWAY

# Addendum C:        Comparable Land Sale Data Sheets

4000 Palmetto Avenue
Pacifica CA 94044
MSA: San Francisco
San Mateo County

| | |
|---|---|
| Submarket: | N/A |
| Property Type: | Land |
| Property Subtype: | Residential (Single-Family) |
| Classification: | N/A |
| ID: | 65904 |
| Master Plan: | N/A |
| Tract/Plat Map: | N/A |
| Planning Area: | N/A |
| Tax Number(s): | 009-401-030 |

## SITE INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Gross Site Area (Acres / Sq.Ft.): | 7.700 | 335,412 | Public Utilities: | | All Available |
| Net Residential Area (Acres / Sq.Ft.): | 7.700 | 335,412 | Electricity: | | Yes |
| Zoning: | | PD | Water: | | Yes |
| Utility: | | Average | Sewer: | | Yes |
| Access: | | Average | Gas: | | Yes |
| Frontage: | | Average | Proposed Use: | | Residential-Condo/PUD |
| Visibility: | | Average | Number of Units: | | 9 |
| Shape: | | Irregular | Base/Min Lot Size (Acres / Sq.Ft.): | 0.00 | 0 |
| Topography: | | Undulating | Base/Min Front Foot: | | N/A |
| Physical Condition: | | N/A | Base/Min Lot Dimensions (Ft): | | N/A |
| Entitlements: | | No | Units per Acre (Gross / Net): | 1.17 | 1.17 |
| Premium Potential: | | N/A | Tax Rate/Special Assessments: | | N/A |

## IMPROVEMENT INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Product Type: | | | N/A | HOA Dues (per Month/per Year): | N/A | N/A |
| Home Size (Min,Avg,Max): | N/A | N/A | N/A | Amenities: | | N/A |
| Retail Pricing (Min,Avg,Max): | N/A | N/A | N/A | Tax Rate/Special Assessments: | | N/A |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Offering | Price per Sq.Ft.: | $8.91 |
| Sale Date: | 4/2018 | Price per Acre: | $558,442 |
| DOM / Exposure Time: | N/A | Price per Unit: | $332,099 |
| Sale Price: | $2,988,888 | Cost to Finished Lot (per Unit): | N/A |
| Grantor: | PNPM Property Management, LLC | Price per Finished Lot: | $332,099 |
| Grantee: | | Price per Finished Front Foot: | N/A |
| Financing: | N/A | Fees at Permit (per Unit): | N/A |
| Document No: | N/A | Price per Finished Lot (with FAP): | $332,099 |
| Value Interest: | Fee Simple | Retail Price per Finished Lot: | N/A |
| Buyer Intention: | N/A | Finished Lot to Home Price Ratio: | N/A |
| Rolling Options: | N/A | Finished Lot to Home Price Ratio (with FAP): | N/A |
| Ground Lease: | No | | |

## VERIFICATION COMMENTS

Michael Stack, listing agent 415.580.9095

## COMMENTS

This parcel is located south of Mussel Rock and has frontage on Palmetto Avenue. This site is located on a mostly west-facing slope that is bisected by a creek. The property was originally listed for sale at $4,000,000 in 2014 but  withdrawn from the market after receiving no serious offers.  It was put back on the market in early November 2017 at $4,300,000 and reportedly received interest, but no offers at this price.  The asking price was reduced in April 2018 to $2,988,888.  The property had preliminary plans by the seller for 9 single family residential units but discussions with the City reportedly revealed that a maximum of 6 houses would be more likely on the site. Any development requires Coastal Commission review.  The asking price was reported to be based on a total of 9 single family lots being allowed although no entitlements are in place.

CUSHMAN & WAKEFIELD



Former Rockaway Quarry

W side Hwy 1 and Rockaway Beach

Pacifica CA 94044
MSA: San Francisco

San Mateo County
Submarket:                  N/A
Property Type:              Land
Property Subtype:           Commercial
Classification:             N/A
ID:                         28518
Tax Number(s):              018-150-110, -120, -150

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 87.460 | Public Utilities: | All Available |
| Site Area (Sq.Ft.): | 3,809,757 | Electricity: | N/A |
| Zoning: | C-3x | Water: | N/A |
| Utility: | Average | Sewer: | N/A |
| Access: | Average | Gas: | N/A |
| Frontage: | Average | Proposed Use: | Mixed Use |
| Visibility: | Good | Maximum FAR: | N/A |
| Shape: | Irregular | Potential Building Area: | N/A |
| Topography: | Undulating | Potential Units: | N/A |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Recorded Sale | Price per Sq.Ft.: | $1.25 |
| Sale Date: | 11/2014 | Price per Acre: | $54,311 |
| Sale Price: | $4,750,000 | Sale Price per Potential Building Area: | N/A |
| Value Interest: | Fee Simple | Price per Potential Units: | N/A |
| Grantor: | Pacifica Lenders, LLC | | |
| Grantee | Preserve of Pacifica LLC | | |
| Financing: | N/A | | |
| Condition of Sale: | None | | |

## VERIFICATION COMMENTS

Confidential

## COMMENTS

Site is the former Rockaway Quarry on west side of Highway 1 with expansive ocean views.  Any development on the site is subject to Coastal Commission approvals.  No entitlements in place for any development at the time of sale.

CUSHMAN & WAKEFIELD

# LAND SALE COMPARABLE 3



Roberts Road at Fassler Avenue

Pacifica CA 94044

MSA: San Francisco

San Mateo County

| | |
|---|---|
| Submarket: | N/A |
| Property Type: | Land |
| Property Subtype: | Subdivision-Residential |
| Classification: | N/A |
| ID: | 341612 |
| Tax Number(s): | 022-150-420 |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 51.000 | Public Utilities: | All Available |
| Site Area (Sq.Ft.): | 2,221,560 | Electricity: | N/A |
| Zoning: | PD | Water: | N/A |
| Utility: | Average | Sewer: | N/A |
| Access: | Average | Gas: | N/A |
| Frontage: | Average | Proposed Use: | Residential-Single-Family |
| Visibility: | Average | Maximum FAR: | N/A |
| Shape: | Irregular | Potential Building Area: | |
| Topography: | Steep | Potential Units: | 10 |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Recorded Sale | Price per Sq.Ft.: | $3.29 |
| Sale Date: | 4/2014 | Price per Acre: | $143,137 |
| Sale Price: | $7,300,000 | Sale Price per Potential Building Area: | N/A |
| Value Interest: | Fee Simple | Price per Potential Units: | $730,000.00 |
| Grantor: | Urban Land Preservation LLC | | |
| Grantee | Sonora Shores III LLC | | |
| Financing: | N/A | | |
| Condition of Sale: | None | | |

## VERIFICATION COMMENTS

Seller

## COMMENTS

This is a hillside development area that had all entitlements in place for 10 single family lots.  Most lots offer expansive ocean views.  Subsequent to the sale, after installation of roadways and infrastructure, property sold  lots/units at asking prices ranging from low $4,000,000s to $5,000,000s.  The purchase prices included single family home plans already approved by the City.

CUSHMAN & WAKEFIELD



60 Christopher Court
Daly City CA 94015-4257
MSA: San Francisco
San Mateo County
Submarket: N/A
Property Type: Land
Property Subtype: Residential (Multi-Family) For Sale
Classification: N/A
ID: 339413
Master Plan: N/A
Tract/Plat Map: N/A
Planning Area: N/A
Tax Number(s): 008-345-020

## SITE INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Gross Site Area (Acres / Sq.Ft.): | 12.740 | 554,954 | Public Utilities: | | All Available |
| Net Residential Area (Acres / Sq.Ft.): | 12.740 | 554,954 | Electricity: | | N/A |
| Zoning: | | U | Water: | | N/A |
| Utility: | | Good | Sewer: | | N/A |
| Access: | | Good | Gas: | | N/A |
| Frontage: | | Good | Proposed Use: | | Residential-Condo/PUD |
| Visibility: | | Good | Maximum FAR: | | N/A |
| Shape: | | Rectangular | Potential Building Area: | | N/A |
| Topography: | | Level | Number of Units: | | 80 |
| Physical Condition: | | N/A | Units per Acre (Gross / Net): | 6.28 | 6.28 |
| Entitlements: | | No | Tax Rate/Special Assessments: | | N/A |
| Premium Potential: | | N/A | | | |

## IMPROVEMENT INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Product Type: | | | N/A | HOA Dues (per Month/per Year): | N/A | N/A |
| Home Size (Min,Avg,Max): | N/A | N/A | N/A | Amenities: | | N/A |
| Retail Pricing (Min,Avg,Max): | N/A | N/A | N/A | Tax Rate/Special Assessments: | | N/A |
| Commercial Space (SqFt): | | | N/A | | | |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Recorded Sale | Price per Sq.Ft.: | $33.88 |
| Sale Date: | 3/2014 | Price per Acre: | $1,475,667 |
| DOM / Exposure Time: | N/A | Sale Price per Potential Building Area: | N/A |
| Sale Price: | $18,800,000 | Price per Unit: | $235,000 |
| Grantor: | Jefferson Elementary School District | Cost to Finished Lot (per Unit): | N/A |
| Grantee: | Lennar Homes of California, Inc. | Price for Finished Lot: | N/A |
| Financing: | N/A | Finished Lot to Home Price Ratio: | N/A |
| Document No: | N/A | | |
| Value Interest: | Fee Simple | | |
| Buyer Intention: | N/A | | |
| Rolling Options: | No | | |
| Ground Lease: | No | | |

## VERIFICATION COMMENTS

Doc. #018582; Representative for the seller

## COMMENTS

The site is located at the top of a hill in Daly City just off Highway 1 and Skyline Boulevard.  At the time of sale it was improved with a vacant public elementary school, that was to be demolished to make way for construction of an 80-home residential subdivision.  The project is known as Crestview Estates and was planned to offer detached homes ranging in size from 1,999 to 2,426 square feet.  Due to the site's orientation, some homes will have Bay views.

CUSHMAN &
WAKEFIELD



801 Fassler Avenue
Pacifica CA 94044
MSA: San Francisco
San Mateo County

| | |
|---|---|
| Submarket: | N/A |
| Property Type: | Land |
| Property Subtype: | Residential (Multi-Family) For Sale |
| Classification: | N/A |
| ID: | 300633 |
| Master Plan: | N/A |
| Tract/Plat Map: | N/A |
| Planning Area: | N/A |
| Tax Number(s): | 022-083-020 and 022-083-030 |

## SITE INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Gross Site Area (Acres / Sq.Ft.): | 11.180 | 487,180 | Public Utilities: | | All Available |
| Net Residential Area (Acres / Sq.Ft.): | 11.180 | 487,180 | Electricity: | | N/A |
| Zoning: | | N/A | Water: | | N/A |
| Utility: | | Average | Sewer: | | N/A |
| Access: | | Average | Gas: | | N/A |
| Frontage: | | Good | Proposed Use: | | N/A |
| Visibility: | | Average | Maximum FAR: | | N/A |
| Shape: | | Irregular | Potential Building Area: | | N/A |
| Topography: | | Rolling | Number of Units: | | 29 |
| Physical Condition: | | N/A | Units per Acre (Gross / Net): | 2.59 | 2.59 |
| Entitlements: | | No | Tax Rate/Special Assessments: | | |
| Premium Potential: | | N/A | | | |

## IMPROVEMENT INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Product Type: | | | N/A | HOA Dues (per Month/per Year): | N/A | N/A |
| Home Size (Min,Avg,Max): | N/A | N/A | N/A | Amenities: | | N/A |
| Retail Pricing (Min,Avg,Max): | N/A | N/A | N/A | Tax Rate/Special Assessments: | | N/A |
| Commercial Space (SqFt): | | | N/A | | | |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Recorded Sale | Price per Sq.Ft.: | $2.87 |
| Sale Date: | 7/2013 | Price per Acre: | $125,224 |
| DOM / Exposure Time: | N/A | Sale Price per Potential Building Area: | N/A |
| Sale Price: | $1,400,000 | Price per Unit: | $48,276 |
| Grantor: | Fassler Associates LLC | Cost to Finished Lot (per Unit): | N/A |
| Grantee: | 1106 Nevada LLC | Price for Finished Lot: | N/A |
| Financing: | N/A | Finished Lot to Home Price Ratio: | N/A |
| Document No: | N/A | | |
| Value Interest: | Fee Simple | | |
| Buyer Intention: | N/A | | |
| Rolling Options: | No | | |
| Ground Lease: | No | | |

## VERIFICATION COMMENTS

MLS# 81220481 / Doc# 103338

## COMMENTS

At the time of sale, the site was approved for 29 condominium units to be located on 1.22 acres with the remainder to be left as open space area. The sale price included all entitlements in place at time of sale. The price per square foot of the 1.22-acre residential area was approximately $26 per square foot.



Harmony
SEC of Roberts Road and Fassler Avenue
Pacifica CA 94044
MSA: San Francisco
San Mateo County

| | |
|---|---|
| Submarket: | N/A |
| Property Type: | Land |
| Property Subtype: | Residential (Single-Family) |
| Classification: | N/A |
| ID: | 23857 |
| Master Plan: | N/A |
| Tract/Plat Map: | N/A |
| Planning Area: | N/A |
| Tax Number(s): | 022-150-420 |

## SITE INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Gross Site Area (Acres / Sq.Ft.): | 53.400 | 2,326,104 | Public Utilities: | | All Available |
| Net Residential Area (Acres / Sq.Ft.): | 53.400 | 2,326,104 | Electricity: | | Yes |
| Zoning: | | PD | Water: | | Yes |
| Utility: | | Average | Sewer: | | Yes |
| Access: | | Average | Gas: | | Unknown |
| Frontage: | | Average | Proposed Use: | | Residential-Single-Family |
| Visibility: | | Average | Number of Units: | | 10 |
| Shape: | | Irregular | Base/Min Lot Size (Acres / Sq.Ft.): | 0.00 | 0 |
| Topography: | | Rolling | Base/Min Front Foot: | | N/A |
| Physical Condition: | | N/A | Base/Min Lot Dimensions (Ft): | | N/A |
| Entitlements: | | No | Units per Acre (Gross / Net): | 0.19 | 0.19 |
| Premium Potential: | | N/A | Tax Rate/Special Assessments: | | N/A |

## IMPROVEMENT INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Product Type: | | | N/A | HOA Dues (per Month/per Year): | N/A | N/A |
| Home Size (Min,Avg,Max): | N/A | N/A | N/A | Amenities: | | N/A |
| Retail Pricing (Min,Avg,Max): | N/A | N/A | N/A | Tax Rate/Special Assessments: | | N/A |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Status: | Recorded Sale | Price per Sq.Ft.: | $1.90 |
| Sale Date: | 10/2011 | Price per Acre: | $82,865 |
| DOM / Exposure Time: | N/A | Price per Unit: | $442,500 |
| Sale Price: | $4,425,000 | Cost to Finished Lot (per Unit): | N/A |
| Grantor: | Cowan-Newton LLC | Price per Finished Lot: | N/A |
| Grantee: | Urban Land Preservation LLC | Price per Finished Front Foot: | N/A |
| Financing: | N/A | Fees at Permit (per Unit): | N/A |
| Document No: | N/A | Price per Finished Lot (with FAP): | N/A |
| Value Interest: | Fee Simple | Retail Price per Finished Lot: | N/A |
| Buyer Intention: | N/A | Finished Lot to Home Price Ratio: | N/A |
| Rolling Options: | No | Finished Lot to Home Price Ratio (with FAP): | N/A |
| Ground Lease: | No | | |

## VERIFICATION COMMENTS

Buyer Representative

## COMMENTS

This is a hillside development site that features views of the Pacific Ocean. A full EIR was completed on the property in 2007.

# Addendum D:    Qualifications of the Appraiser





**Melissa Bach, MAI** Executive Director

Valuation & Advisory
Practice Group Member | Dispute Analysis & Litigation Support
Cushman & Wakefield Western, Inc.

## Professional Expertise

Melissa Bach, MAI, joined Cushman & Wakefield Western, Inc., in January 2013 as the Managing Director of the San Francisco Valuation & Advisory office, overseeing both the San Francisco and Walnut Creek areas. Ms. Bach is also with Cushman & Wakefield's Valuation & Advisory group in the Dispute Analysis & Litigation Support (DALS) practice, providing real estate economics and valuation expertise. Previous to joining Cushman & Wakefield, Ms. Bach was with Carneghi-Blum & Partners Inc. from 1988-2012, where she was a Managing Partner in their Walnut Creek office.

Ms. Bach has been a commercial real estate professional in appraisal, valuation and real estate economics since 1988. Her valuation and consulting assignments have included a wide variety of property types including residential projects (single and multi-family land, subdivisions and master-planned communities), industrial parks, small to large-scale industrial facilities, office buildings (all classes), retail centers, medical office, mixed-use properties and a wide variety of development sites. Clients include financial institutions, federal state, county and municipal agencies and governments, property owners, developers, REITs, law firms, domestic and foreign investment firms, and insurance companies.

She has specialized knowledge and experience having completed appraisals and provided consulting analyses on projects including affordable housing developments financed with bond financing and/or Low Income Housing Tax Credits (LIHTCs), conservation easements, wetlands, submerged tidelands, airport facilities, and condemnation properties. Ms. Bach has also provided consulting services for a variety of clients to furnish Opinions of Reasonableness for projects throughout the country pursuant to Revenue Procedure 2014-12 (Safe Harbor) concerning Section 47 Historic Preservation Tax Credits.

Ms. Bach has provided litigation support and been qualified as an expert witness in court, providing analyses for complex litigation, eminent domain, bankruptcy, and specialized projects. She has also acted as an arbitrator in resolving matters on issues of real estate values, ground rents, space lease renewals and related issues. She has been qualified as a real estate expert and provided testimony in various Superior Courts, United States Bankruptcy Court, Superior Court of Justice (Canada), and before the American Arbitration Association. She is a senior member of the Dispute Analysis & Litigation Support (DALS) group with Cushman & Wakefield.

### Memberships, Licenses, Professional Affiliations and Education

- Designated Member, Appraisal Institute (MAI #11930). As of the current date, Melissa Bach, MAI has completed the requirements of the continuing education program of the Appraisal Institute.

- Certified General Real Estate Appraiser in the following states:
  - California – AG017144
  - Oregon – C001324

- Bachelor of Arts, Wellesley College

- Appraisal Institute Service
  - California Government Relations Subcommittee (2014-present; Chair 2017-)
  - National Nominating Committee (2015)
  - Advisor (2013-present)
  - President, Northern California Chapter, 2012
  - Vice President, Northern California Chapter, 2011
  - Treasurer, Northern California Chapter, 2010
  - Secretary, Northern California Chapter, 2009
  - Member, Board of Directors, Northern California Chapter, 2006-2008
  - Region 1 Representative, 2008-2012
  - Experience Review Committee (screener), 2008-present

### Speaking Engagements

- Panelist, "*Valuation of Airport Properties", 2016 Commercial Symposium: Appraising Unique and Special Purpose Properties,* Northern California Chapter of the Appraisal Institute; Oakland, California December 2016.

- Panelist, *Real Estate Valuation: Overview & Applications*, Buchalter Nemer PC; Phoenix, Arizona May 2016.

- Moderator, *Honing the "Expert" in Expert Witness*, Northern California Chapter of the Appraisal Institute; Woodside, California May 2016.

- Panelist, *Recent Court Decisions Affecting Real Estate Valuation*; Southern California Chapter of the Appraisal Institute; Los Angeles, November 2015

- Panelist, Finding the Sweet Spot in the Commercial Marketplace, Fisher Center for Real Estate and Urban Economics, Real Estate & Economics Symposium, San Francisco, November 2012.

- Moderator and Panelist, *Valuation of Affordable Housing*, Northern California Chapter of the Appraisal Institute, Oakland, September 2011.

- Moderator, *Industrial Market Update*, Northern California Chapter of the Appraisal Institute, San Francisco, November 2009.

- Moderator and Panelist, *Affordable Housing Valuation*, Northern California Chapter of the Appraisal Institute, Oakland, April 2008.

- Moderator and Panelist, *The Financing of Affordable Housing*, Northern California Chapter of the Appraisal Institute, Pleasanton, March 2004

**Other Accomplishments and Awards**

- Claudia B. Carleton, MAI, Legacy in Leadership Award 2015 – Northern California Chapter of the Appraisal Institute
- Service Excellence Award 2014 – Cushman & Wakefield

**CALIFORNIA**



**Oregon**

